UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
                                  :

DENNIS MCCONKEY,                            :

                   Plaintiff,             :

                                    :         24-cv-6091 (LJL)

      -v-                         :

                                    :      OPINION AND ORDER

THE CHURCHILL SCHOOL AND CENTER,     :

                  Defendant.         :

                                  :
-----------------------------------------------------------------------X

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
DOC #:_____
DATE FILED:__7/23/2025__

LEWIS J. LIMAN, United States District Judge:

      Plaintiff Dennis McConkey ("McConkey" or "Plaintiff") brings claims against his former employer, The Churchill School and Center ("Churchill" or "Defendant"), for age and sexual orientation discrimination and retaliation under the Age Discrimination in Employment Act of 1967 ("ADEA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), Sections 291 and 296 of the New York State Human Rights Law ("NYSHRL"), and Sections 8-101 and 8-107 of the New York City Human Rights Law ("NYCHRL").

      Defendant moves, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the complaint against it for failure to state a claim upon which relief can be granted.  Dkt. No. 11.

      For the following reasons, Defendant's motion is granted in part and denied in part.

## BACKGROUND

      For purposes of this motion, the Court accepts the well-pleaded allegations of the complaint as true.  *See York v. Ass'n of the Bar of the City of N.Y.,* 286 F.3d 122, 125 (2d Cir.), *cert. denied,* 537 U.S. 1089 (2002).

McConkey is a former instructor at Churchill.  Dkt. No. 1 ("Compl.") ¶ 9.  McConkey is a gay man.  *Id.* ¶ 1.  Churchill is a not-for-profit corporation that operates a K-12 school for students with learning disabilities in Manhattan.  *Id.* ¶¶ 10, 15.

McConkey graduated with a Bachelor of Science degree from Skidmore College in 1984 and obtained an M.F.A from the University of Pennsylvania in 1990.  *Id.* ¶ 11.  Prior to his employment at Churchill, he gained experience teaching undergraduate and continuing education classes, acting as a teaching assistant, and showing his artwork in various venues.  *Id.* ¶¶ 13–14.

McConkey began work for Churchill on December 2, 1992, as an assistant art teacher for K–8 students and was promoted to Head of the Art Department and Head Art Teacher in 1995.  *Id.* ¶¶ 16–17.  His role was expanded to cover K–12 students with Churchill's development of a high school in 1999.  *Id.* ¶ 17.  McConkey lost the title of Head of the Art Department purportedly due to the school being too small to have department heads, but he remained Head Art Teacher and head of "Student Transition Planning."  *Id.* ¶ 21.

In or about 2006, Churchill appointed McConkey, Jason Wallin ("Wallin"), and two other teachers to be Deans, each leading a grade in the high school.  *Id.* ¶ 18.  Wallin is a heterosexual man.  *Id.* ¶ 19.  Wallin referred to McConkey as the "best" of the Deans during his time as a Dean but also made repeated homophobic comments towards him.  *Id.* ¶ 20.  Churchill appointed Wallin to be Acting Principal of the high school in or about 2014 and elevated him to Principal in 2015.  *Id.* ¶ 22.  Timothy Madigan ("Madigan"), a heterosexual man, became the new Head of School in 2015.  *Id.* ¶ 23.

McConkey worked at Churchill for almost 30 years until, in or about October 2022, his employment was terminated.  *Id.* ¶ 9.

## I.    Misconduct by Wallin and Others at Churchill

In 2001, a distraught student came to McConkey's classroom late in the day and informed McConkey that he was upset because of something written on the dry-erase board in Wallin's classroom. *Id.* ¶ 24. The student said the message had been there all day. *Id.* McConkey entered Wallin's classroom where he saw "Dennis is a fucking fag" written on the board. *Id.* ¶¶ 25. McConkey asked Wallin "in a professional manner" why he had not erased the offensive message, and Wallin claimed to have not noticed it. *Id.* ¶ 25.

Beginning in or around 2014, while in the roles of Acting Principal and then Principal, Wallin conducted McConkey's annual reviews. *Id.* ¶ 26. Wallin would begin the reviews by remarking on how "great McConkey was with students" before bringing up the dry-erase board incident and how he felt intimidated by McConkey in that moment. *Id.* ¶ 27. McConkey was upset by the repeated mention of this event and felt as though Wallin was using the slur each year. *Id.* Wallin made repeated reference to the dry-erase board event and Wallin's claims of offense in meetings with McConkey to, allegedly, "reinforce the power he had over McConkey." *Id.* ¶¶ 28–29.

McConkey alleges that Wallin's repeated mention of the dry-erase incident was part of a larger pattern of consistent homophobic remarks and biased comments made by Wallin and others as part of Churchill's "heterocentric" culture. *Id.* ¶¶ 30–31. For example, when Churchill hired a new teacher who was gay, Wallin would mention that McConkey would "like" them; Wallin would not do so when the new teacher was heterosexual. *Id.* ¶ 32. In Fall 2022, Wallin also disciplined an openly gay male student for wearing a tank top, but did not discipline the two female students with him who were not openly gay and wearing similar tank tops. *Id.* ¶ 33. Additionally, Wallin told McConkey he could not support reappointing "someone like you," which, in context, McConkey perceived as a reference to his sexual orientation. *Id.* ¶ 34.

3

Wallin also referring to McConkey as being "institutional memory," which McConkey does not recall Wallin using to refer to any other teachers. *Id.* ¶¶ 35–36. McConkey alleges that characterizing him as the school's "institutional memory" was an instantiation of Wallin's ageism. *Id.*

McConkey also experienced bias at Churchill from other staff members. For instance, in or about 2002, then-Principal Glenn Corwin noticed McConkey had a photo of his partner on his desk, leading to a meeting between McConkey, Corwin, and Head of School Kristy Baker. *Id.* ¶ 38. McConkey was told that "no one should know he was in a relationship" despite the fact that multiple heterosexual teachers had photos of their spouses or partners in their classrooms and were not told to take them down. *Id.*

The environment at Churchill allegedly contributed to a transgender teacher leaving in or about 2022 because they "did not feel supported." *Id.* ¶ 39. Additionally, McConkey alleges that other older employees had recently been dismissed or pushed out including: "(1) a teacher about 58 years old who had been at Churchill for 37 years who was dismissed toward the end of the 2021–2022 school year; (2) an administrator about 65 years old, who disappeared one day; (3) a teacher who was older and after many years pressured to 'retire'; and (4) an elementary school teacher in her early 60s who also was pressured to 'retire.'" *Id.* ¶ 40.

## II.    McConkey's Complaint to Churchill

In September 2021, McConkey, inspired by a sexual harassment training, spoke with Churchill's Director of Diversity, Ashley Greene, about Wallin's repeated reference to the time McConkey was called a slur. *Id.* ¶¶ 41–42. Greene told McConkey that the conduct was "significant" and "wasn't okay" but did not take further action to address the conduct. *Id.* ¶ 43.

On June 14, 2022, McConkey emailed Annita Bruna ("Bruna"), the Assistant Head of School, to inform her of the dry-erase incident, his report to Greene, the "institutional memory"

comment as a "code for old," Wallin's "gossip and 'trash talk' about other teachers," and Wallin's history of being written up for misgendering staff. *Id.* ¶ 44. McConkey viewed the conduct as prompted by potential homophobia and ageism. *Id.* McConkey indicated in the email he wanted to go "on record" with an administrator, but, after Bruna told McConkey they "should discuss the matter," McConkey never heard back and was not able to speak with her due to her repeated unavailability. *Id.* ¶¶ 45–46. Bruna had previously noted to McConkey at the Equity Initiative during the 2021–22 school year that "ageism" was the "real problem" at Churchill. *Id.* ¶ 47. Neither Bruna nor Churchill addressed the June 14th email or spoke to McConkey about it further. *Id.* ¶ 48. Classes ended on June 17, 2022; McConkey did not work at Churchill during the summer recess but returned for orientation for the 2022–23 school year in August 2022. *Id.* ¶ 49.

### III.    Wallin's False Accusations

McConkey alleges that Wallin made multiple false accusations against him over the years, dismissing McConkey's attempts to defend himself as McConkey's inability to "accept criticism." *Id.* ¶ 51. In May 2021, McConkey received a "very positive" review from Wallin for a school year which McConkey taught remotely and was informed he would be receiving a raise and bonus; however, in June 2021, Wallin informed McConkey via email that he would not be receiving a bonus due to "an anonymous, false accusation." *Id.* ¶¶ 52–53. Wallin never asked for McConkey's side of the accusation, and, upon reviewing his personnel file later, McConkey found it did not contain any complaints about him. *Id.* ¶ 54.

### IV.    McConkey's Firing by Churchill

On October 18, 2022, McConkey noticed two female students ("Student A" and "Student B") were not in attendance, even though he had walked to class with one of them, and he was informed by other students that they were likely in the bathroom. *Id.* ¶ 56. McConkey's

assistant was not present at the time, and many other faculty members were out that day for an outing. *Id.* After fifteen minutes of waiting, McConkey decided to look for the students in the hallway, and, after not finding them there, he went to the girl's bathroom. *Id.* At this point, McConkey pushed the door open a few inches with his foot, called for Student A, and immediately stepped back. *Id.* ¶ 56. Student B opened the door enough for McConkey to see her face and McConkey asked if Student A was in the bathroom. *Id.* Student B said that she was, and that another female student in the bathroom ("Student C") had been knocked across the room when McConkey opened the door. *Id.* McConkey, however, had not felt any resistance when opening the door, and in any case, he had not opened the door with enough force to propel a high school student across a room. *Id.* McConkey asked Student B and Student C to return to class and both Student B and Student C came out of the bathroom with Student C not appearing upset. *Id.* After returning to class, McConkey's assistant eventually arrived and was instructed to check on Student A, who the assistant reported was in the bathroom with another girl ("Student D"). *Id.* Student A and Student D returned to McConkey's class shortly, as Student D was in McConkey's next class, and Student A did not say anything upon returning. *Id.*

On the evening of October 18, 2022, McConkey received an email about the incident and was suspended by Churchill pending an investigation. *Id.* ¶ 57. McConkey received an email the following morning from Madigan to attend a meeting with Madigan on October 20, 2022. *Id.* ¶ 58. On October 20, 2022, McConkey met with Madigan, Bruna, and Wallin. *Id.* ¶ 59. After sharing his perspective on the incident, including that he had opened the door only a few inches, McConkey stated that the security camera outside the bathroom could be used to confirm his account. *Id.* On October 27, 2022, McConkey was called back to the school for a meeting that same day at 3:30 p.m., which occurred at around the same time as a school assembly.

*Id.* ¶ 60.  The meeting lasted only a couple of minutes.  *Id.* ¶ 61.  McConkey was informed by

Madigan that he would be fired after twenty-one days of personal leave and was handed

severance documents, including a letter claiming that McConkey had kicked open the door to the

girls' bathroom and had knocked a student into the sink.  *Id.* ¶ 61.

McConkey alleges that video evidence available to Churchill would confirm that

McConkey did not kick in the door or do anything to knock a student into the sink, and the video

evidence would also capture the students leaving the bathroom showing their demeanor.  *Id.* ¶

62.  The evidence was readily available to the school and would have shown Churchill's

narrative of the incident to be false.  McConkey alleges the incident was used as pretext to fire an

older gay teacher who had complained about bias.  *Id.* ¶ 63.

Since his firing, members of Churchill's leadership, including Linda Price, the Head of

the Mental Health Department, have made derogatory statements about McConkey and his

firing, discussing and misrepresenting the circumstance of the firings to others.  *Id.* ¶ 64.  After

his firing, McConkey's assistant, who was in her mid-thirties at the time, was given his position

and duties.  *Id.* ¶ 65.

## PROCEDURAL HISTORY

McConkey filed a complaint against Churchill on August 12, 2024.  Dkt. No. 1.

He alleges eight claims for relief: (1) age discrimination under the ADEA, 29 U.S.C. §

623(a), Compl. ¶¶ 66–69; (2) gender discrimination under Title VII, 42 U.S.C. § 2000e-2(a)(1),

Compl. ¶¶ 70–73; (3) age, gender, and sexual orientation discrimination under the NYSHRL,

N.Y. Exec. Law § 296(1)(a), Compl. ¶¶ 74–77; (4) age, gender, and sexual orientation

discrimination under the NYCHRL, New York City Admin. Code §§ 8-107(1)(a), 8-502, Compl.

¶¶ 78–81; (5) retaliation under the ADEA, 29 U.S.C. § 623(d), Compl. ¶¶ 82–85; (6) retaliation

under Title VII, 42 U.S.C. § 2000e-3(a), Compl. ¶¶ 86–89; (7) retaliation under the NYSHRL,

7

N.Y. Exec. Law § 296(7), Compl. ¶¶ 90–93; and (8) retaliation under the NYCHRL, New York

City Admin. Code § 8-107(7), Compl. ¶¶ 94–97.

Churchill filed this motion to dismiss on September 5, 2024. Dkt. No. 11. Churchill

filed a memorandum of law in support of the motion to dismiss, Dkt. No. 13, as well as an

affirmation of Samuel G. Dobre, counsel to Churchill, Dkt. No. 12, with three accompanying

exhibits—the Equal Employment Opportunity Commission ("EEOC") charge of discrimination,

Dkt. No. 12-1, the New York State Division of Human Rights Determination and Order After

Investigation, Dkt. No. 12-2, and the October 27, 2022, termination letter purportedly sent by

Churchill to McConkey, Dkt. No. 12-3.[1] On October 25, 2024, Plaintiff filed a memorandum of

---

[1] Generally, for the purposes of a motion to dismiss, a court may not look beyond facts stated on the face of the complaint, documents appended to, incorporated in, or integral to the complaint, and matters of which judicial notice may be taken. *See Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, 632 F. Supp. 3d 402, 435–36 (S.D.N.Y. 2022). For a document to be considered integral, the complaint must, "[rely] heavily upon its terms and effect." *In re Turquoise Hill Res. Ltd.*, 2024 WL 4711185, at *8 (S.D.N.Y. Nov. 7, 2024) (quoting *Searle v. Red Creek Cent. Sch. Dist.*, 2023 WL 3398137, at *2 (2d Cir. May 12, 2023)). "Incorporation by reference requires a reference that is 'clear, definite, and substantial,' rather than merely 'passing.'" *Turquoise Hill*, 2024 WL 4711185, at *8 (quoting *Trump v. Vance*, 977 F.3d 198, 210 n.8 (2d Cir. 2020)). Though the Court may take judicial notice of "documents in the public record at the Motion To Dismiss stage, it considers them only to establish their existence and legal effect, or to determine what statements they contained not for the truth of the matters asserted." *2002 Lawrence R. Buchalter Alaska Trust v. Philadelphia Financial Life Assur. Co.*, 96 F.Supp.3d 182, 206 (S.D.N.Y. March 31, 2015) (citation omitted); *see also Saudagar v. Walgreens Co.*, 2019 WL 498349, at *4 (S.D.N.Y. February 8, 2019) (taking judicial notice of NYSDHR Order and EEOC Notice); *Lee v. Springer Nature Am., Inc.*, 769 F. Supp. 3d 234, 247 (S.D.N.Y. 2025). Plaintiff's Charge of Discrimination is mentioned only once in his complaint, and it is only mentioned as to the date when it was filed. Compl. ¶ 8. The complaint does not mention even once or rely upon information contained within the Determination and Order from the NYSDHR. *See* Compl. As to the termination letter, Plaintiff states that he received it on October 27, 2022, and that it, "falsely claimed that he had kicked the door to the girls' room open with such force that he supposedly had knocked a student into the sink." *Id.* ¶¶ 60–61. Accordingly, the Court takes judicial notice of the EEOC and NYSDHR documents only for the fact of their existence and dates of issuance, not for the truth of their content. Because there is no dispute as to its authenticity, the termination letter is incorporated by reference but only considered for the fact of having been received by Plaintiff, not for its truth. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

law in opposition to the motion to dismiss.  Dkt. No. 17.  On November 13, 2024, Defendant

filed a reply memorandum of law in further support of the motion to dismiss.  Dkt. No. 19.

## LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual

allegations in the complaint and draw all possible inferences from those allegations in favor of

the plaintiff.  *See York*, 286 F.3d at 125.  This requirement "is inapplicable to legal conclusions."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Thus, a complaint must include "sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  A complaint must offer more than

"labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked

assertion[s]" devoid of "further factual enhancement."  *Twombly*, 550 U.S. at 555, 557.  The

ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "Determining whether a complaint states a

plausible claim for relief will . . . be a context-specific task that requires the reviewing court to

draw on its judicial experience and common sense."  *Id.* at 679.  Put another way, the plausibility

requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal

evidence [supporting the claim]."  *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v.*

*Siracusano*, 563 U.S. 27, 46 (2011).

Generally, when adjudicating a 12(b)(6) motion, a court will "not look beyond 'facts

stated on the face of the complaint, . . . documents appended to the complaint or incorporated in

the complaint by reference, and . . . matters of which judicial notice may be taken.'"  *McSweeney*

*v. Cohen,* 2025 WL 966022, at *10 (S.D.N.Y., March 31, 2025) (quoting *Goel v. Bunge, Ltd.*,

820 F.3d 554, 559 (2d Cir. 2016)); *see Goe v. Zucker*, 43 F.4th 19, 29 (2d Cir. 2022); *Gray v.*

*Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 383 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021).  The court may consider a document when "the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint."  *McSweeney*, 2025 WL 966022 at *28 n.18 (quoting *Turquoise Hill*, 2024 WL 4711185, at *8).  For a document to be integral to or incorporated by reference in a complaint, there must be "more than a mention or even limited quotations."  *Id.* (quoting *Turquoise*, 2024 WL 4711185 at *8).  Rather, the document must be "necessary to the 'short and plain statement of the claim showing that [a plaintiff is] entitled to relief.'"  *Id.* (quoting *Turquoise*, 2024 WL 4711185 at *8 (quoting Fed. R. Civ. P. 8(a)(2))).

Additionally, affirmative defenses "usually cannot be considered on a motion to dismiss."  *McSweeney*, 2025 WL 966022 at *10 (quoting *Doe 1 v. Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d 387, 400 (S.D.N.Y. 2023)).  However, while "the statute of limitations is ordinarily an affirmative defense that must be raised in the answer," *id.* (quoting *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014) (citation omitted)), the Second Circuit has held that "[d]ismissal under Fed. R. Civ. P. 12(b)(6) is appropriate when a defendant raises . . . [a statutory bar] as an affirmative defense and it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law."  *Staehr v. Hartford Financial Services Group, Inc.*, 547 F.3d 406, 426 (2d. Cir. 2008) (quoting *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000)).  "If it appears from a complaint that claims are *prima facie* time-barred, those claims can only survive dismissal if a plaintiff 'plausibly alleges that they fall within an exception to the applicable statute of limitations.'"  *McSweeney*, 2025 WL 966022 at *10 (quoting *Strusman v. NYU Langone Hosps.*, 2020 WL 3415111, at *3 (S.D.N.Y. June 22, 2020)); *see also Clark v.*

*Hanley*, 89 F.4th 78, 94 (2d Cir. 2023) (stating that a defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint).

## DISCUSSION

Plaintiff asserts eight claims for age and sexual orientation discrimination and retaliation under federal, state, and city civil rights laws based on his termination by Defendant in October 2022.  Defendant moves to dismiss all of Plaintiff's claims under Rule 12(b)(6).

## I.    Statute of Limitations

The claims arising under Title VII, the ADEA, NYSHRL, and NYCHRL are subject to different statutes of limitations.  *See McSweeney*, 2025 WL 966022 at *34.  Under Title VII and the ADEA, a plaintiff must "file a complaint with the Equal Employment Opportunity Commission [ ] or an equivalent state agency within 300 days of the allegedly discriminatory action."  *Richards v. Department of Education of City of New York*, 2022 WL 329226 at *6 (S.D.N.Y. Feb. 2, 2022); *see Bernstein v. New York City Department of Education*, 2021 WL 4429318 at *5 (S.D.N.Y. Sep. 27, 2021) ("Plaintiff [may] not assert a federal age discrimination claim based on acts that occurred more than 300 days before his filing of the NYSDHR/EEOC notice").  "[O]nly incidents that took place within the timely filing period are actionable."  *Richards*, 2022 WL 329226 at *6.  The 300-day look-back period is triggered by the filing of an administrative complaint addressing the specific type of discrimination at issue.  *See, e.g.*, *McSweeney*, 2025 WL 966022 at *34; *Bowen v. MTA N.Y.C. Transit Auth.*, 2011 WL 7940367, at *7 (E.D.N.Y. Dec. 29, 2011); *Bailey v. Colgate-Palmolive Co.*, 2003 WL 21108325, at *11–14 (S.D.N.Y. May 14, 2003), *aff'd*, 93 F. App'x 321 (2d Cir. 2004).

With respect to Plaintiff's federal sex/gender and age claims, the relevant date is December 27, 2022, when he filed a charge against Churchill alleging "unlawful age and sex discrimination" with the EEOC.  Compl. ¶ 8.  Accordingly, only incidents that took place on or

after March 2, 2022 (300 days before December 27, 2022) are actionable under Title VII and the ADEA.  Both Plaintiff and Defendant agree on this date.  *See* Dkt. No. 17 at 16; Dkt. No. 19 at 1.

Under NYSHRL and NYCHRL, the statute of limitations is three years.  *See* N.Y. Exec. Law § 297(5); N.Y.C. Admin. Code § 8-502(d).  The limitations period for both statutes ordinarily is tolled during the pendency of an administrative complaint.  *See* N.Y.C. Admin. Code § 8-502(d) ("Upon the filing of a complaint with . . . the state division of human rights and during the pendency of such complaint and any court proceeding for review of the dismissal of such complaint, such three-year limitations period shall be tolled."); *Banks v. General Motors, LLC*, 81 F.4th 242, 260 (2d. Cir. 2023) ("This three-year statute of limitations is tolled during the period in which a complaint is pending before the New York State Department of Human Rights or with the EEOC." (citing *Esposito v. Deutsche Bank AG*, 07-cv-6722, 2008 WL 5233590, at *4–5 (S.D.N.Y. Dec. 16, 2008))).  Accordingly, only incidents which took place on or after March 20, 2020, are actionable under the NYSHRL and NYCHRL.  Both Plaintiff and Defendant agree on this date as well.  *See* Dkt. No. 17 at 16; Dkt. No. 19 at 1.

Even if a discriminatory act does not fall within the statute of limitations, "those acts may still 'provide relevant background evidence to any timely claims.'"  *Bernstein*, 2021 WL 4429318 at *5 (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 88 (2d Cir. 2015)); *see also Davis-Garrett v. Urban Outfitters, Inc.*, 921 F.3d 30, 42 (2d Cir. 2019) ("[E]ven with respect to a claim of discrete discriminatory or retaliatory acts, expiration of limitations period does not bar 'an employee from using the prior acts as background evidence in support of a timely claim.'" (quoting *Morgan*, 536 U.S. at 105)); *Harewood v. N.Y.C. Dep't of Ed.*, 2019 WL 3042486, at *4 (S.D.N.Y. May 8, 2019) ("[D]iscrete acts of discrimination that occurred outside the 300-day period [still] . . . provide relevant background evidence to any timely

claims.").  Even where the acts, "standing alone . . . could not suffice to uphold a finding [of discrimination] . . . they do add support, in combination with the other evidence, to th[at] ultimate conclusion."  *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 177 (2d. Cir. 2005) (quoting *Roebuck v. Drexel Univ.,* 852 F.2d 715, 733 (3d Cir. 1988)).  The Court may therefore consider actions and comments that would be time-barred if brought as independent claims where they constitute relevant background evidence.

## II.    Claims Relating to Sexual Orientation

Defendant moves to dismiss McConkey's claims for discrimination and retaliation on the basis of his sexual orientation under Title VII, NYSHRL, and NYCHRL.

## A.  Discrimination on the Basis of Sex/Sexual Orientation

Defendant argues that McConkey fails to allege that he was terminated because of his sexual orientation, urging that McConkey was instead terminated because he "kicked open the door to a girl's restroom with such force that it knocked over one of the students."  Dkt. No. 13 at ECF 7.

Title VII makes actionable certain forms of employment discrimination on the basis of sexual orientation, among other protected characteristics.  *See Bostock v. Clayton County, Georgia*, 590 U.S. 644, 655, 683 (2020); 42 U.S. Code § 2000e-2(a)(1) (providing that is unlawful for an employer to, "discharge an individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex").  "[T]o defeat a motion to dismiss or a motion for judgment on the pleadings in a Title VII discrimination case, a plaintiff must plausibly allege that (1) the employer took adverse action against him, and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision."  *Vega*, 801 F.3d at 87.

An adequate showing of the second element may be made either by plausibly alleging the four elements of a *prima facie* case of discrimination under the framework first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), "or by otherwise . . . identifying 'bits and pieces of evidence' that together give rise to an inference of discrimination," *Vega*, 801 F.3d at 87 (quoting *Gallagher v. Delaney*, 139 F.3d 338, 342 (2d Cir. 1998)); *see also Buon v. Spindler*, 65 F.4th 64, 82–85 (2d Cir. 2023); *Troeger v. JetBlue Airways Corp.*, 2024 WL 5146185, at *9 (S.D.N.Y. Dec. 17, 2024). Under the *McDonnell Douglas* three-step burden-shifting framework, a plaintiff must show that "(1) [he] belonged to a protected class; (2) [he] was qualified for the position she held; (3) [he] suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Fischman v. Mitsubishi Chem. Holdings Am., Inc.*, 2023 WL 4763257, at *5 (S.D.N.Y. July 26, 2023) (citing *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d. Cir. 2003)). Importantly, "a plaintiff is not required to plead a *prima facie* case under *McDonnell Douglas,* at least as the test was originally formulated, to defeat a motion to dismiss." *Vega*, 801 F.3d at 84. "[A]t the initial stage of a litigation, the plaintiff's burden is 'minimal'—he need only plausibly allege facts that provide 'at least minimal support for the proposition that the employer was motivated by discriminatory intent.'" *Id.* at 86–87 (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015)). "An inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in [discriminatory] terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" *Littlejohn*, 795 F.3d at 312 (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502

(2d Cir. 2009)).  Discrimination must be the "but-for" cause of the adverse employment action, *Bostock*, 590 U.S. at 656, but, by definition, "there can be more than one 'but-for' cause of an adverse employment action," *Banks*, 81 F.4th at 275; *Bostock,* 590 U.S. at 656 (observing that the but-for test is a "sweeping standard" and that "[o]ften, events have multiple but-for causes").

An "adverse employment action" for the purposes of Title VII discrimination must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *McSweeney*, 2025 WL 966022, at *32 (quoting *Vega*, 801 F.3d 72 at 85). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id*. (quoting *Vega*, 801 F.3d at 85 (internal quotations omitted)).  In the instant case, McConkey was terminated, which plainly constitutes an adverse employment action for the purposes of Title VII.  Compl. ¶ 9.

McConkey has properly alleged that as a gay man, *Id*. ¶ 11, he is a member of a protected class under Title VII's prohibition on sex-based discrimination, *see Troeger*, 2024 WL 5146185, at *9.  Additionally, McConkey has adequately pleaded that he is qualified for the position he was terminated from through both education and experience, having worked at Churchill between 1992 and 2022.  *Id.* ¶¶ 9, 16.  Accordingly, the questions in this case are whether (1) McConkey has properly pleaded "sufficient 'bits and pieces of evidence' to raise a plausible inference of intentional discrimination" on the basis of his sexual orientation, *Troeger*, 2024 WL 5146185, at *10, and (2) whether he has properly pleaded that discrimination on the basis of his sexual orientation was a "but-for" cause of his termination,  *Bostock*, 590 U.S. at 656.

Given Plaintiff's "minimal" burden at the motion to dismiss stage, he has succeeded in "plausibly alleg[ing] facts that provide 'at least minimal support for the proposition that the employer was motivated by discriminatory intent.'" *Vega*, 801 F.3d at 86–87 (quoting *Littlejohn*, 795 F.3d at 311).

McConkey alleges a longstanding pattern of incidents with Wallin which provide evidence of discriminatory animus towards McConkey as a gay man. McConkey alleges that in 2001, a homophobic slur directed at McConkey was written on Wallin's whiteboard, which was brough to McConkey's attention by a distraught student. Compl. ¶¶ 24–25. When McConkey confronted Wallin about the message, Wallin claimed he had not noticed it. *Id.* For years after the incident and up until McConkey's firing, Wallin repeatedly brought up the whiteboard incident, including in each annual review that he conducted with McConkey as the Acting Principal and later Principal. ¶¶ 27–29. In the annual reviews and in other meetings, Wallin would bring up the 2001 incident, saying, "remember that time . . .," claiming that McConkey intimidated him during the incident and that he was scared. *Id.* ¶ 27. Wallin also consistently commented to McConkey that McConkey would like newly hired gay teachers, something he did not do with heterosexual hires. *Id.* ¶ 32. At a different point, Wallin told McConkey that he could not support reappointing "someone like you," which McConkey understood from the context to be a reference to McConkey's sexual orientation. *Id.* ¶ 34.[2]

Defendant is correct that many of Wallin's homophobic remarks occurred prior to December 27, 2022, and therefore outside of the statute of limitations for Title VII. Both sides

---

[2] McConkey also describes an incident in 2022 in which Wallin disciplined an openly gay male student for a dress code violation while ignoring similar violations by female students who were not openly gay. *Id.* ¶ 33. However, McConkey does not allege facts to suggest that any homophobic remarks were made in the course of this disciplinary action, nor that the student in question reported experiencing the action as homophobic. *See* Dkt. No. 31 at 7.

agree that the "continuing violation" doctrine is inapplicable, as McConkey's claim is for a discrete termination decision, not an ongoing violation. *See* Dkt. No. 17 at 16; Dkt. No. 13 at 7–8. However, McConkey is correct that such incidents as are alleged above may be offered as evidence of discriminatory animus, regardless whether they could be cognizable as incidents of actionable discrimination. *See Morgan*, 536 U.S. at 102 ("[Title VII] does [not] bar an employee from using the prior acts as background evidence to support a timely claim."); *Troeger*, 2024 WL 5146185, at *10 (noting that "actions [that] fall outside of the limitations period . . . may serve as evidence of discriminatory motivation" even if " they are not actionable as discrete adverse employment actions under Title VII"). Such remarks may be construed as evidence of impermissible bias if they amount to more than "stray remarks." *See Pierre v. City of N.Y.*, 2020 WL 353538, at *8 (S.D.N.Y. Jan. 21, 2020), *aff'd*, 844 F. App'x 411 (2d Cir. 2021). "In analyzing whether remarks are probative of discriminatory animus or whether they are just stray remarks, courts assess '(1) who made the remark, i.e., a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, i.e., whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, i.e., whether it was related to the decisionmaking process.'" *Id. (*quoting *Schreiber v. Worldco, LLC*, 324 F. Supp. 2d 512, 519 (S.D.N.Y. 2004) (collecting cases)).

Drawing all inferences in favor of McConkey, it is plausible that Wallin's comments, particularly his alleged yearly recounting of the whiteboard incident, reflect a pattern of homophobic animus against McConkey for being a gay man. Though Wallin's comments might be open to a degree of interpretation as to whether they are suggestive of bias, at the motion to dismiss stage, the Court must draw all inferences in favor of Plaintiff's claim. *See Gregory v.*

*Daly*, 243 F.3d 687, 697–98 (2d Cir. 2001) ("The exact meaning of the remark is far from clear, but there are two interpretations of it that, given the context in which it allegedly was made, lend support to the notion that [plaintiff's] sex played a role in her discharge. . . . In either case, and after drawing all reasonable inferences that support plaintiff's claim, the remark lends support to the notion that [plaintiff's] sex played a significant causal role in the chain of events leading to her termination.").  The inference that the comments are discriminatory is supported by the language of the writing in Wallin's classroom in the first place and by Wallin's other comments plausibly suggestive of bias.  On the pleadings, Wallin's yearly repetition of the whiteboard incident cannot be characterized as merely a "stray remark," given the frequency of its invocation, the fact its invocation in sensitive annual review meetings in which the power dynamic between McConkey as a subordinate and Wallin as his supervisee was most salient, and its immediate connection to and evocation of a homophobic slur.  Of course, McConkey has not alleged that Wallin mentioned the whiteboard incident during or in the immediate leadup to the termination meeting.  However, this is hardly surprising—as alleged by McConkey, the termination decision was based on the pretext of the bathroom door incident, such that Wallin would have no reason to mention the whiteboard incident.

Having adequately pleaded animus on the part of Wallin, McConkey adequately pleads that Churchill was motivated by discriminatory intent in firing him.[3]

---

[3] McConkey also pleads a number of purportedly homophobic remarks and actions on the part of other Churchill staff.  He alleges that in 2002, then-Principal and Head of School Glenn Corwin instructed McConkey not to display a photo of his partner, a restriction that was not imposed on heterosexual teachers.  Compl. ¶ 38.  Additionally, Plaintiff alleges that Defendant's environment of bias led to discomfort for other LGBTQ+ staff, with a transgender teacher leaving in 2022 due to the unwelcoming atmosphere.  *Id.* ¶ 39.  The 2002 incident, though suggestive of homophobic animus, is in no way alleged to be related to McConkey's termination, as Corwin is not alleged to have been in a position of authority at the time of McConkey's termination, and in any event, the single incident from more than 20 years prior falls into the

When "an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive," the employer can nevertheless be held liable for retaliation under a "cat's paw" theory if the supervisor was "manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action." *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016); *Menaker v. Hofstra Univ.*, 935 F.3d 20, 38 (2d Cir. 2019) ("[S]o long as the agent intended and was the proximate cause of the adverse result, the agent's discriminatory intent may be imputed to the employer under traditional agency principles."). "The cat's paw theory requires the plaintiff to show 'an employer in effect adopt[ed] an employee's unlawful animus by acting *negligently* with respect to the information provided by the employee, and thereby afford[ed] that biased employee an outsize role in its own employment decision.'" *Edelman v. NYU Langone Health Sys.*, 708 F. Supp. 3d 409, 435 (S.D.N.Y. 2023) (quoting *Vasquez*, 835 F.3d at 272), *aff'd in relevant part*, 141 F.4th 28 (2d Cir. 2025).

In fact, the "impermissible bias of a single individual at any stage" of a promotion or termination process "may taint the ultimate employment decision . . . so long as the individual shown to have the impermissible bias played a meaningful role in [that] process." *Ferrell v. Leake & WattsServs., Inc.*, 83 F. App'x 342, 346 (2d Cir. 2003) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999)); *see also Pierre*, 2020 WL 353538, at *8. "This is true even absent evidence of illegitimate bias on the part of the ultimate decision maker so long as the individual shown to have the impermissible bias played a meaningful role" in the promotion or termination process. *Ferrell*, 83 F. App'x at 346 (quoting *Bickerstaff*, 196 F.3d at 450); *see also*

---

category of "stray remark."

*Conahan v. MedQuest Ltd.,* 2022 WL 16748585, at *7 (S.D.N.Y. Nov. 7, 2022) (finding a reasonable jury could find that the wife of the ultimate decision maker directly influenced the decision maker with her impermissible bias).

It is undisputed that Wallin played a meaningful role in McConkey's termination. Wallin served as the Acting Principal and then Principal of the high school from 2014 to 2022. *Id.* ¶¶ 9, 22. Wallin was in the initial October 20th meeting with Madigan and Bruna in which McConkey explained his side of the October 18th incident. Compl. ¶ 59. Though it was ultimately Madigan that informed McConkey that he was fired on October 27, 2022, *id.* ¶ 61, it is reasonable to infer both from Wallin's position as McConkey's supervisor and his presence in the initial meeting that his role in the termination process was substantial.

Defendant suggests that the bathroom incident, even as alleged in Plaintiff's complaint, tends to show that Defendant had a legitimate, nondiscriminatory reason for terminating McConkey, such that discriminatory animus cannot be a but-for cause of his termination. Dkt. No. 13 at 11. McConkey alleges that the proffered reasons for his termination were pretextual. Compl. ¶ 55.

At this stage, the Court must take McConkey's allegations as true. He denies he engaged in any improper behavior. *Id.* ¶¶ 56, 62. He also has pleaded that when he met with Madigan, Bruna, and Wallin, he gave his account of what happened and stated that the security camera footage would corroborate his account. *Id.* ¶¶ 59, 62. He also alleges that the video recordings were available to the school. *Id.* ¶ 62. McConkey further alleges that Churchill either reviewed the video recordings and knew that the account provided by the students was false, or it failed to review them even though it could have viewed them and readily determined that the students' account was false. *Id.* ¶ 63. Taking the allegations as true, McConkey has sufficiently pleaded

pretext at this stage.  Either the administrators viewed the video and, notwithstanding the content of the video and McConkey's own testimony, inexplicably favored the uncorroborated views of the students, or the administrators chose not to review the video footage at all.  Either way, accepting McConkey's pleading that the video would have refuted the allegations against him, an inference of bias may arise. *See Menaker*, 935 F.3d at 34 ("'[W]hen the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side (without an apparent reason based in the evidence), it is plausible to infer (although by no means necessarily correct) that the evaluator has been influenced by bias.' Similarly, where decision-makers choose 'to accept an unsupported accusatory version over [that of the accused], and declined even to explore the testimony of [the accused's] witnesses,' this too 'gives plausible support to the proposition that they were motivated by bias.'" (quoting *Doe v. Columbia Univ.*, 831 F.3d 46, 57 (2d Cir. 2016))).  On a motion to dismiss, McConkey need not *prove* that the reasons for his termination were pretextual but only allege facts that would support such a conclusion because "competing explanations are better evaluated at the summary judgment stage or beyond."  *Vega*, 801 F.3d at 89; *see also Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230-31 (2d Cir. 2014) ("That there may be other explanations for the defendants' employment decisions does not render [a plaintiff's] allegations of discrimination inadequate as a matter of law.  Whether there existed non-pretextual, non-discriminatory explanations for the defendants' employment decisions—a question as to which the defendants bear the burden of production . . . is not properly decided on a motion to dismiss for failure to state a claim.").

Drawing all factual inferences in favor of McConkey, it is plausible that Wallin's bias against McConkey played an impermissible role in his firing.  *See Troeger*, 2024 WL 5146185, at *11 ("Though [defendant] argues that [p]laintiff does not assert any facts suggesting that there

is any link between these alleged remarks and any adverse employment action that was actually made by a relevant [defendant] decision-maker . . , the Court must draw plausible inferences in favor of [plaintiff].").  Therefore, McConkey has met his burden of showing a "minimal inference" of discriminatory intent by Churchill as a result of Wallin's influence on the decision to terminate McConkey.  *See Vega*, 801 F.3d at 86–87.  At this stage, McConkey need not show that Wallin's homophobic animus was the only cause of his termination—he need only plead, as he has done, that Wallin's animus was one of the but-for causes of his termination.  The motion to dismiss McConkey's claim for gender/sex discrimination under Title VII is accordingly denied.

Like Title VII, the NYSHRL makes it unlawful "[f]or an employer . . . because of an individual's . . . sexual orientation . . . to discriminate against such individual . . . in terms, conditions, or privileges of employment."  N.Y. Exec. Law § 296(1)(a).  The NYCHRL similarly makes it unlawful "[f]or an employer . . . because of the . . . sexual orientation . . . of any person . . . [t]o discriminate against such person in compensation or in terms, conditions or privileges of employment."  N.Y.C. Admin. Code § 8-107(a).  Following a set of 2019 amendments to the NYSHRL, "the standard for [NYSHRL] claims [is] closer to the standard of the NYCHRL." *Livingston v. City of New York*, 563 F. Supp. 3d 201, 232 n.14 (S.D.N.Y. 2021).  Here, "[b]ecause Plaintiff's NYSHRL claims accrued after the most recent amendments, they rise and fall with [his] NYCHRL claims."  *Nofal v. IMCMV Times Square LLC*, 2024 WL 1138928, at *4 (S.D.N.Y. Mar. 15, 2024) (internal quotations omitted); *Syeed v. Bloomberg L.P.*, 568 F. Supp. 3d 314, 345 (S.D.N.Y. 2021) ("[T]he amended NYSHRL adopts the same standard as the NYCHRL.").

"These laws are less demanding of plaintiffs than Title VII on discrimination claims." *Nofal*, 2024 WL 1138928, at *4; *see Cadet v. All. Nursing Staffing of N.Y., Inc.*, 632 F. Supp. 3d 202, 235 (S.D.N.Y. 2022) ("[F]ederal civil rights statutes serve as a floor below which the City's Human Rights law cannot fall.").  "In order to prevail on a claim of discrimination under the NYCHRL, a plaintiff must prove that unlawful discrimination was one of the motivating factors of the complained-of conduct."  *Bilitch v. N.Y.C. Health & Hosp. Corp.*, 148 N.Y.S. 3d 238, 244 (N.Y. App. Div. 2021). When applying this standard, "district courts must be mindful that the NYCHRL is not a general civility code," and a plaintiff must still establish "a discriminatory motive" for any complained-of conduct.  *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) ("It is not enough that a plaintiff has an overbearing or obnoxious boss. She must show that she has been treated less well at least in part *because of* her [protected characteristic].").

Because McConkey has adequately pleaded discrimination on the basis of sexual orientation under Title VII, his claims under NYSHRL and NYCHRL "necessarily survive[]." *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 327 (S.D.N.Y. 2020); *Makhsudova v. City of New York*, 2022 WL 1571152, at *10 (S.D.N.Y. May 18, 2022) ("What suffices to constitute a viable claim for discrimination under Title VII and the NYSHRL necessarily suffices to constitute a viable claim under the NYCHRL.").

## B.  Retaliation for Sex-Related Protected Activity

Defendant argues that McConkey's retaliation claim should be dismissed because he "fails to plausibly plead any causal connection between his termination of employment and any protected activity."  Dkt. No. 13 at ECF 7–8.  Defendant does not dispute that McConkey engaged in protected activity but rather argues that the four-month gap between the protected

activity and the termination decision defeats any causal inference between the two. *Id.* at ECF 15.

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Title VII retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *See Littlejohn*, 795 F.3d at 315. "A prima facie case of retaliation under Title VII requires that the pleading show: '(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'" *Shultz v. Congregation Shearith Israel of City of New York*, 867 F.3d 298, 309 (2d Cir. 2017) (quoting *Littlejohn*, 795 F.3d at 316). "Stated otherwise, for a retaliation claim to survive a motion to dismiss, 'the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against him, (2) 'because' he has opposed any unlawful employment practice." *Richards*, 2022 WL 329226 at *15 (quoting *Vega*, 801 F.3d at 90).

Defendant does not dispute that the first, second, and third elements are easily met on the facts alleged in this case.

First, McConkey has adequately alleged that he engaged in protected activity. "A complaint of discrimination constitutes protected activity if (1) the plaintiff holds a good-faith belief that he suffered discrimination because of a protected characteristic and (2) that belief is reasonable." *Bamba v. United States Department of Homeland Security*, 2024 WL 3924810 at

*12 (S.D.N.Y. Aug. 23, 2024) (citing *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)).  McConkey "need not establish that the conduct [he] opposed was actually a violation of [these laws]."  *Summa v. Hofstra Univ.*, 708 F.3d 115, 126 (2d Cir. 2013). McConkey alleges that he made multiple complaints about Wallin's discriminatory conduct in the year leading up to his firing.  Compl. ¶¶ 42–48.  In September 2021, Churchill conducted a sexual harassment training, during which the repeated reference to past harassment was cited as an example of harassment.  *Id*. ¶ 41.  Shortly thereafter, McConkey raised concerns with Churchill's Director of Diversity, Ashley Greene, who acknowledged that Wallin's behavior was "significant" and "wasn't okay" but took no further action.  *Id*. ¶¶ 42–43.  On June 14, 2022, McConkey emailed Bruna, Churchill's Assistant Head of School, describing the original whiteboard incident, Wallin's "use of the incident to harass McConkey," and his discussion with Greene.  *Id*. ¶ 44.  McConkey also reported Wallin's repeated reference to McConkey's "institutional memory," stating it "can be perceived as code for old."  *Id*.  McConkey further noted that Wallin "had been written up for misgendering staff."  *Id.*  McConkey wrote that these experiences could be framed as homophobia and ageism, "none of which is okay," and expressed his desire to "go on record with an administrator."  *Id*. ¶¶ 44–45.  After receiving the June 14, 2024, email, Bruna told McConkey that they should discuss the matter, but never followed up with him.  *Id*. ¶ 46.  McConkey tried reaching Bruna several times, but she was repeatedly unavailable.  *Id*.  McConkey's repeated attempts to report conduct which he perceived as discriminatory to Defendant's Director of Diversity and Assistant Head of School are paradigmatic examples of protected activity.

Second, McConkey has also adequately pled knowledge on Defendant's part of his protected activity.  "The 'knowledge' element is established at the prima facie stage if there is

'general corporate knowledge that the plaintiff has engaged in a protected activity.'" *Bamba*, 2024 WL 3924810, at *12 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000)).  McConkey's email to Bruna detailing the alleged discrimination he faced gives rise to an inference of general corporate knowledge of the protected activity due to Bruna's role as Assistant Head of School.  Compl. ¶ 44.

Third, McConkey's termination clearly constitutes a "materially adverse" action for the purposes of retaliation.  In the context of a retaliation claim, "an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Vega*, 801 F.3d at 90 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)).  "This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination." *Id*.  Termination is plainly sufficient to constitute an adverse employment action for the purposes of a discrimination or retaliation claim.

What remains is the fourth element, whether McConkey has established a "causal connection between the protected activity and the adverse employment action." *Littlejohn*, 795 F.3d at 316.  "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . requir[ing] proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Bamba*, 2024 WL 3924810 at *13 (quoting *Univ. of Tx. Sw. Med. Cntr. v. Nassar*, 570 U.S. 338, 360 (2013)). "Causation can be established either directly through evidence of retaliatory animus or indirectly by demonstrating that the adverse employment action followed quickly on the heels of the protected activity or through other evidence such as disparate treatment of fellow employees." *Massaro v. N.Y. City Dep't of Educ.*, 2022 WL 1788203, at *2 (2d Cir. June 2, 2022), *cert. denied*, 143 S. Ct. 372 (2022).  "But-for causation does not, however, require proof

that retaliation was the only cause of the employer's action, but only that the adverse action

would not have occurred in the absence of the retaliatory motive." *Richards*, 2022 WL 329226

at *16 (quoting *Vega*, 801 F.3d at 91).

In drawing the inference of a causal relationship between the protected activity and the

adverse employment action, the time elapsed between the two matters. The Second Circuit has

not drawn a "bright line to define the outer limits beyond which a temporal relationship is too

attenuated to establish a causal relationship between the exercise of a federal constitutional right

and an allegedly retaliatory action." *Summa*, 708 F.3d at 128. "Rather, the inquiry is context-

specific, permitting courts to 'exercise [their] judgment about the permissible inferences that can

be drawn from temporal proximity in the context of particular cases.'" *Siclari v. New York City

Dep't of Educ.*, 2020 WL 7028870, at *9 (S.D.N.Y. Nov. 30, 2020) (Nathan, J.) (quoting

*Summa*, 708 F.3d at 128); *see also Banks v. Gen. Motors, LLC*, 81 F.4th 242, 278 (2d Cir. 2023)

(holding that six month time period supported a reasonable inference of causation); *Gorzynski v.

JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("Though [the Second Circuit] has not

drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond

which a temporal relationship is too attenuated to establish causation, we have previously held

that five months is not too long to find the causal relationship."). Indeed, it is "the combination

of reasonably close temporal proximity and the particular context in this case" which determines

whether there is a causal connection. *Summa*, 708 F.3d at 128. Where a longer period of time

has elapsed, "other supporting factual allegations," i.e., "surrounding circumstances," may still

be "sufficient to allow an inference of causation." *Siclari*, 2020 WL 7028870, at *9 (describing

the Second Circuit's reasoning in *Summa*); *see also Munoz v. Sociedad Espanola De Auxilio

Mutuo y Beneficiencia De Puerto Rico*, 671 F.3d 49, 56 (1st Cir. 2012) (finding five-year gap

between protected activity and adverse employment decision not "too remote to establish

causality" where it was not the "only" evidence of retaliation).

One factual setting in which causality may still be inferred despite a relatively long gap in

time is when there is evidence that defendants "waited to exact their retaliation at an opportune

time." *Espinal*, 558 F.3d at 129.  In *Espinal*, the Second Circuit found that "the passage of only

six months between the [protected activity] and an allegedly retaliatory beating by officers . . . is

sufficient to support an inference of a causal connection" where it was "plausible that the officers

waited to exact their retaliation at an opportune time—as when Espinal was involved in a fight

with another inmate—in order to have a ready explanation for any injuries suffered by Espinal."

*Id.*  In *Summa*, the Second Circuit similarly found a causal nexus where four months had elapsed

between the protected activity and the adverse action but the action was taken "at the first actual

opportunity to retaliate."  708 F.3d at 128.  In that case, the plaintiff's protected activity occurred

on the last day of the fall football season in 2006, and plaintiff was denied the position as

football manager a few days prior to the start of the spring football season in 2007.  *Id.*

McConkey alleges that he was terminated on a pretextual basis on October 27, 2022,

roughly four months after his email to Bruna on June 14, 2022.  Compl. ¶¶ 44–46, 61.

McConkey.  Classes ended for the 2021–22 school year on or around June 17, 2022, and

McConkey did not return to work until the end of August 2022.  *Id.* ¶ 49.  Though Defendant

argues that this four-month gap "is too attenuated to support causation based upon temporal

proximity alone."  Dkt. No. 13 at 15.  However, given the summer vacation and the fact that

McConkey was terminated roughly one month after returning to work for the 2022–23 school

year, McConkey has adequately plead a causal nexus between his protected activity and his

termination.  *See Bamba*, 2024 WL 3924810, at *19 ("Causation may be inferred from a longer

gap when there is evidence that the 'adverse action occurred at the first actual opportunity to retaliate.'" (quoting *Summa*, 708 F.3d at 128)).  Drawing all inferences in his favor, McConkey has pleaded enough facts to suggest that Defendant "waited to exact their retaliation at an opportune time" by waiting until the new school year had commenced and terminating McConkey upon the first available pretext.  *Espinal*, 558 F.3d at 129.

Accordingly, McConkey has adequately pleaded Title VII retaliation on the basis of his protected activity.

The standard for retaliation under the NYSHRL and NYCHRL is the same as under Title VII, except that NYSHRL and NYCHRL do not require an "adverse employment action" in order to state a claim for retaliation.  *See Moore v. Hadestown Broadway Limited Liability Company*, 722 F.Supp.3d 229, 247 (S.D.N.Y. 2024).  Rather, under the NYSHRL and NYCHRL, the plaintiff need only plead that "something happened that was reasonably likely to deter a person from engaging in protected activity."  *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 67 (S.D.N.Y. 2020).  "[O]therwise, the burden on the other three prongs of a prima facie retaliation claim under the federal antidiscrimination law is identical to the NYSHRL and NYCHRL standards."  *McSweeney*, 2025 WL 966022 at *26 n.16 (citing *Moore*, 722 F. Supp. at 247).  Accordingly, McConkey's claims for retaliation under the NYSHRL and NYCHRL are likewise sufficiently plead.

## III.    Claims Relating to Age

### A.    Discrimination on the Basis of Age

Defendant argues that McConkey's claims for discrimination based on age must be dismissed for the same reasons as his claims based on sexual orientation, i.e., failure to plead but-for causation in light of the bathroom incident and failure to plead any plausible evidence of discriminatory animus or disparate treatment.  Dkt. No. 13 at ECF 8–12.

The ADEA provides that it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a)(1). This protection extends to employees who are over the age of 40. *Id.* § 631(a). "To establish a prima facie case of age discrimination, a plaintiff must show that (1) he is within the protected age group, (2) he was qualified for the position, (3) he experienced adverse employment action, and (4) such action occurred under circumstances giving rise to an inference of discrimination." *Bernstein*, 2021 WL 4429318 at *4; *see Green v. Town of E. Haven*, 952 F.3d 394, 403 (2d Cir. 2020); *Gorzynski*, 596 F.3d at 107; *Vega*, 801 F.3d 72 at 86–87. Moreover, "a plaintiff alleging age discrimination under the ADEA must allege that age was the but-for' cause of the employer's adverse action." *Bernstein*, 2021 WL 4429318 at *4 (cleaned up). At the present stage, Plaintiff need only "plausibly allege that age was a 'but-for' cause of an adverse employment action" and this burden at the motion to dismiss stage is minimal. *Mitchell v. New York City Dep't of Educ.*, No. 24-992, 2025 WL 978366, at *2 (2d Cir. Mar. 31, 2025) (quoting *Littlejohn*, 795 F.3d 297 at 313). "The test for finding but-for causation 'directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause.'" *Bernstein,* 2021 WL 4429318 at *10 (quoting *Bostock*, 590 U.S. at 656).

In the instant case, McConkey was terminated, which plainly constitutes an adverse employment action for the purposes of both Title VII and the ADEA. Compl. ¶ 9. McConkey has adequately alleged that he is a member of a protected class the ADEA. *Id.* ¶ 11. Additionally, McConkey has adequately plead that he is qualified for the position he was terminated from through both education and experience, *id.* ¶¶ 9, 16.

Accordingly, the question is whether McConkey has properly pleaded that (1) Defendant was motivated by discriminatory animus against McConkey on the basis of his age; and (2) that age discrimination was a 'but-for' cause of McConkey's firing.

McConkey alleges that his termination was part of a larger pattern of firings and forced retirements of older faculty who were each old enough to be within the same protected class of McConkey. Compl. ¶ 40. The Second Circuit has previously found that alleging a number of employees were fired and replaced by employees outside of the protected class to be sufficient to support a claim under federal antidiscrimination law at the motion to dismiss stage. *See Mitchell*, 2025 WL 978366 at *3 (pleading that multiple Black male staff were fired and replaced by younger Hispanic staff was sufficient to support claims under Title VII and the ADEA); *Leibowitz v. Cornell University*, 584 F.3d 487, 502–03 (2d Cir. 2009) (pleading that older Black women were replaced by younger male instructors and Plaintiff was not offered employment in another position was sufficient at the motion to dismiss stage). However, McConkey's allegations are distinguishable and fail to support his claim for multiple reasons.

When taken individually, the firing of older employees noted by McConkey do not all support a claim of discrimination. Of the four employees, only two are plausibly alleged to have been both in the protected class and faced an adverse employment action: the 58-year-old who "who had been at Churchill for 37 years who was dismissed toward the end of the 2021-2022 school year" and the "elementary school teacher in her early 60s who also was pressured to 'retire.'" Compl. ¶ 40. The remaining two employees described in the complaint are "an administrator about 65 years old, who disappeared one day" and "a teacher who was older and after many years pressured to 'retire.'" *Id.* The former does not allege any adverse action by the school, and the latter does not allege that the teacher was clearly within the protected class.

McConkey also importantly fails to allege that the replacements for each of these older faculty were not within the same protected class under the ADEA. *See Delaney v. Bank of Am. Corp.*, 908 F. Supp. 2d 498, 505 (S.D.N.Y. 2012) (holding that plaintiff failed to establish an inference of discrimination by identifying two older employees that were laid off because plaintiff did not provide any evidence as to whether, *inter alia*, the older employees were terminated by the same individual that terminated the plaintiff or were replaced by younger workers). Without allegations that these older employees were replaced with younger employees outside the protected class, the causal connection between their age and their removal becomes too attenuated.

McConkey further alleges that after his termination, his responsibilities were taken by his assistant. Compl. ¶ 65. He alleges that the assistant was in her "mid-thirties" at the time, putting her outside the protected class of the ADEA. *Id*. ¶ 65. However, a "school system is not required to replace a teacher who decides to retire with a teacher of equal or greater age on pain—that if it does not do so—it will be subject to an age discrimination lawsuit. Some allegation must be made to link the conduct giving rise to the claim of an adverse employment action to that of the defendant in hiring the replacement employee." *Bernstein*, 2021 WL 4429318 at *8; *see also Marcus v. Leviton Mfg. Co.*, 661 F. App'x 29, 33 (2d Cir. 2016) ("[T]he mere fact that an older employee was replaced by a younger one does not plausibly indicate discriminatory motive."); *Cocca-Rau v. Standard Insurance Company*, 2020 WL 4207442, at *8 (S.D.N.Y. July 22, 2020) (finding that a single allegation that plaintiff "was replaced by much younger . . . workers" was insufficient to give rise to inference of discriminatory causality).

The statement by Bruna that "ageism" was the "real problem" at Churchill and Wallin's comment about McConkey being an "institutional memory" both fail to support a claim for age discrimination. *Id.* ¶¶ 36, 47.

Bruna's comment may provide general support to the idea that there was ageism among some individuals working at Churchill, but they do not provide support for the claim that, but-for McConkey's age he would not have been fired. *Vega*, 801 F.3d at 86. That comment does not suggest that Bruna herself was motivated by ageism—in fact, it suggests the opposite.

Wallin's characterization of McConkey as "institutional memory" is also insufficient to suggest bias. Though the remark clearly refers to McConkey's tenure at the school, the overall tenor of the remark is neutral to positive as it relates to the McConkey's breadth of experience and knowledge of the institution. McConkey's allegation that his subjective experience of the remark as negative does not suffice, without more, to undergird McConkey's ADEA claim. *See McDonald v. Maimonides Med. Ctr.*, 2002 WL 257818, * 6 (E.D.N.Y. Jan. 3, 2002) (finding that plaintiff's "subjective feelings as to what Dunn might have been thinking cannot amount to evidence of age discrimination"). Even if the characterization was insensitive, it is at most a "stray remark," insufficient to support a claim of age discrimination under the NYSHRL and NYCHRL, let alone under the more stringent standards of the ADEA. *See Adams v. Equinox Holdings, Inc*., 662 F. Supp. 3d 444, 458 (S.D.N.Y. 2023), *aff'd*, 2024 WL 1787108 (2d Cir. Apr. 25, 2024) (ADEA); *Nelson v. Argyropoulous*, 2021 WL 4352313, at *2 (S.D.N.Y. Sept. 24, 2021) ("[U]nder the NYCHRL, isolated incidents of unwelcome verbal . . . conduct have been found to constitute the type of petty slights and trivial inconveniences that are not actionable."); *Lent v. City of New York*, 175 N.Y.S.3d 525, 526 (1st Dep't 2022) ("The alleged stray remark by defendant [] that plaintiff was 'old enough to retire' did not, without more, give rise to an

inference of ageist bias."); *Wei v. Antehm Inc.*, 2018 WL 5622571, at *13 (E.D.N.Y. Sept. 4, 2018) ("[N]otwithstanding the uniquely broad and remedial purpose of the NYCHRL, this isolated incident of unwelcome verbal conduct is insufficient to support an age discrimination under NYCHRL's broad provisions.").

McConkey does not adequately plead that, but-for his age, he would not have been fired from Churchill. Accordingly, Defendant's motion to dismiss his claim for age discrimination under the ADEA is granted.

As to his claims for age discrimination pursuant to the NYSHRL and NYCHRL, McConkey fails to adequately allege that the other terminated older employees were fired under similar circumstances to him, that younger employees were treated more favorably, or that the older employees were replaced by younger teachers. *See Lively v. Wafra Inv. Advisory Grp., Inc.*, 180 N.Y.S.3d 92, 94 (1st Dep't 2022) (dismissing a claim for failure to plead that comparators were terminated for similar reasons, that "younger employees were treated more favorably," or that older "employees were replaced by younger workers"); *Thomas v. Mintz*, 122 N.Y.S.3d 21, 22 (1st Dep't 2020) (requiring plaintiffs to "allege that defendants' actions occurred under circumstances that give rise to an inference of discrimination."). Therefore, Defendant's motion to dismiss McConkey's claims for age discrimination arising under NYSHRL and NYCHRL is also granted.

## B. Retaliation for Age-Related Protected Activity

Defendant argues that McConkey's claims for retaliation on the basis of his age-related protected activity should be dismissed for the same reason as his claims for retaliation based on sexual orientation, i.e., for lack of a temporal or other nexus between the protected activity and his termination. Dkt. No. 13 at ECF 14–16.

Because the same standards and burdens apply to claims of retaliation in violation of the ADEA as to violations of Title VII, *see Terry*, 336 F.3d at 141 (citing *Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir. 2000)), the foregoing analysis largely applies to McConkey's age-related retaliation claims.

McConkey's June 14, 2022, email to Bruna described Wallin's repeated reference to McConkey's "institutional memory," stating it "can be perceived as code for old."  Compl. ¶ 44. McConkey characterized those statements as ageism and expressed his desire to "go on record with an administrator."  *Id*. ¶¶ 44–45.

Defendant does not dispute that McConkey's email to Bruna constitutes protected activity, nor that McConkey's termination constitutes an adverse employment action.  *See*, supra. For the same reasons set forth above, the four months elapsed between the email to Bruna and the termination is not too long under the circumstances to draw a causal inference between the two.  Accordingly, McConkey has adequately pleaded ADEA retaliation on the basis of his protected activity, as well as retaliation under the NYSHRL and NYCHRL.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is GRANTED as to McConkey's claims for age discrimination under the ADEA, NYSHRL, and NYCHRL; DENIED as to McConkey's claim for age-related retaliation under the ADEA, NYSHRL, and NYCHRL; and DENIED as to sex-related discrimination and retaliation under Title VII, NYSHRL, and NYCHRL.

The Clerk of Court is respectfully directed to close Dkt. No. 11.

SO ORDERED.

Dated: July 23, 2025
      New York, New York
                                        LEWIS J. LIMAN
                             United States District Judge