UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

DENNIS MCCONKEY,

                      Plaintiff,

        -v-

THE CHURCHILL SCHOOL AND CENTER,

                    Defendant.

------------------------------------------------------------------------X

24-cv-6091 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Defendant The Churchill School and Center ("Defendant" or "Churchill") moves, pursuant to Federal Rule of Civil Procedure 56, for an order granting it summary judgment against the complaint of Plaintiff Dennis McConkey ("Plaintiff" or "McConkey").  Dkt. No. 85. Plaintiff moves, pursuant to Federal Rule of Civil Procedure 37(e), for an order granting him spoliation sanctions against Defendant.  Dkt. No. 75.  For the reasons that follow, Defendant's motion is granted and Plaintiff's motion is denied.

## BACKGROUND[1]

### I.     Relevant Persons

Churchill is a comprehensive K-12 college preparatory independent school in New York City serving students with specific language-based learning disabilities and language disorders.

---

[1] Plaintiff agrees that incidents before March 2, 2022 may be considered only as relevant background evidence for his federal claims, and that incidents before March 20, 2020 may be considered only as background evidence for his State and City claims because the incidents are otherwise time-barred.  Dkt. No. 101 at 12; *see Zagerson v. N.Y.C. Dep't of Educ.*, 2022 WL 292917, at *7 (S.D.N.Y. Jan. 31, 2022) (noting that Title VII plaintiff must make EEOC filing within 300 days of alleged discriminatory conduct and that NYSHRL and NYCHRL claims are governed by a three-year statute of limitations).

Dkt. No. 88 ("Statement of Undisputed Facts" or "SUF") ¶ 1; Dkt. No. 109 ("Counterstatement of Undisputed Facts" or "CSUF") ¶ 1.

McConkey is a 63-year-old gay man. CSUF ¶ 224; Dkt. No. 130 ("Response to Counterstatement of Undisputed Facts" or "RSUF") ¶ 224. McConkey was an art teacher at Churchill from 1992 until he was fired on October 27, 2022. CSUF ¶ 225; RSUF ¶ 225. McConkey began working for Churchill in December 1992 as an assistant art teacher for kindergarten through eighth grade students prior to the development of the high school. SUF ¶ 11; CSUF ¶ 11. In 1995 or 1996, he was promoted to Head of the Art Department and Head Art Teacher. SUF ¶ 12; CSUF ¶ 12. In 1999, his role expanded to include kindergarten through twelfth grade students when Churchill developed a high school program. SUF ¶ 13; CSUF ¶ 13. In 2012 or 2013, he was removed from the role of Head of the Art Department by then-Head of School Robert Seibert, but he maintained his position as Head Art Teacher, a position he remained in throughout his employment. SUF ¶¶ 14–15; CSUF ¶¶ 14–15.

Jason Wallin ("Wallin") began working at Churchill in 2001 as an assistant social studies teacher. SUF ¶ 3; CSUF ¶ 3. He was appointed as Co-Principal of the high school and subsequently Principal in 2015. SUF ¶ 4; CSUF ¶ 4. He has held the position of Principal of the Upper School for the past twelve years. SUF ¶ 5; CSUF ¶ 5. In that role, Wallin served as McConkey's direct supervisor. SUF ¶ 6; CSUF ¶ 5.

Dr. Timothy Madigan ("Madigan") became Head of School at Churchill in 2015. SUF ¶ 8; CSUF ¶ 8.

Annita Bruna ("Bruna") began working at Churchill in 2004 as an assistant teacher. SUF ¶ 9; CSUF ¶ 9. Bruna became Assistant Head of School at Churchill in 2021 and has held that role ever since. SUF ¶ 10; CSUF ¶ 10.

2

## II.      Plaintiff's Experiences at Churchill

For at least some, Plaintiff was a beloved and accomplished teacher.  He was a student advisor in Churchill's advisory program, which supported students and positioned advisors as the primary point of contact for each student and their family.  CSUF ¶ 255; RSUF ¶ 255.  He was a good student advisor.  CSUF ¶ 255; RSUF ¶ 255.  He also was in charge of the school's Learning Lenses program, which was designed to educate students about their learning disability and how to frame that disability and see it as an opportunity for growth and understanding.  CSUF ¶ 257; RSUF ¶ 257.  He also was an art mentor in Churchill's art mentoring program and was in charge of Churchill's LGBTQ+ affinity group.  CSUF ¶¶ 258–59; RSUF ¶¶ 258–59.  There is evidence that LGBTQ students gathered in his classroom because he made it feel comfortable and provided them with a safe space.  CSUF ¶¶ 260–61; RSUF ¶¶ 260–61.

There were a number of incidents, however, that punctuated his tenure at Churchill and that, at a minimum, created an issue with Wallin.

In 2001, a student informed Plaintiff about a comment written on a dry-erase whiteboard in Wallin's classroom that had been there all day and that had made the student very upset.  CSUF ¶¶ 293–94; RSUF ¶¶ 293–94; Dkt. No. 103 ¶ 22.  Plaintiff, whose first name is Dennis, visited the classroom and saw on the whiteboard, "Dennis is a fucking fag."  CSUF ¶ 295; RSUF ¶ 295; Dkt. No. 103 ¶ 23.  According to Plaintiff, he asked Wallin, who was in the classroom at the time, why he had not erased the offensive message.  CSUF ¶¶ 295–96; RSUF ¶¶ 295–96; Dkt. No. 103 ¶ 23.  Wallin responded that he had not noticed it, and Plaintiff dropped the matter.  CSUF ¶ 297; RSUF ¶ 297; Dkt. No. 103 ¶ 23.  According to Defendant, Wallin was not at school on the day the alleged whiteboard slur was written and only learned of it the next day, when he heard from a teacher that McConkey was upset and then spoke to McConkey.  SUF ¶¶ 41–42;

3

Dkt. No. 86-2 at 80:5–82:7.  It is undisputed that Wallin did not write the message on the whiteboard.

Wallin began to conduct Plaintiff's annual reviews when Wallin became Acting Principal, and he continued to do as Principal.  CSUF ¶ 298; RSUF ¶ 298.  At every annual review meeting, Wallin would start by talking about how great Plaintiff was with students.  CSUF ¶ 299; RSUF ¶ 299.  But then he also would bring up the 2001 incident with the homophobic slur on the white board, saying, "remember that time . . ." and claiming that Plaintiff had intimidated him during the incident and that he was scared.  CSUF ¶ 299; RSUF ¶ 299; Dkt. No. 103 ¶ 25.  Plaintiff claims to have been distressed at Wallin's references to the incident, believing that Wallin was essentially calling Plaintiff the slur every year at his review and showing his power over Plaintiff.  CSUF ¶¶ 300–01; RSUF ¶¶ 300–01; Dkt. No. 103 ¶ 26.

More generally, Plaintiff asserts that throughout his employment at Churchill, the school exposed him to homophobic comments, mostly micro-aggressions, that happened over the years, CSUF ¶ 304, and that Churchill had a toxic, macho, "good old boys club," hetero-centric culture, mostly in the high school, where the cisgendered, straight, white men "protect[ed]" each other, *id.* ¶ 305.  He asserts that Wallin made homophobic comments throughout the years in front of him.  *Id.* ¶ 306.[2]  As examples, Plaintiff notes that when Churchill hired a gay teacher, but not when it hired a heterosexual teacher, Wallin would tell Plaintiff that he was going to like the person.  CSUF ¶ 307.  And, in the fall of 2022, Wallin disciplined an openly male gay student for

---

[2] McConkey claims that in addition to making biased comments about and to McConkey, Wallin made biased or ignorant comments about and to others in the LGBTQ+ community at Churchill.  CSUF ¶ 312; Dkt. No. 86-5 at 25:7–36:12 (Ashley Greene, Churchill's former DEI Director, testifying that Wallin was "unaware of the appropriate ways to say things" and "not very versed in issues in the LGBTQ plus community").

violating the dress code by wearing a tank top but not the two female students who were standing with him and who also were wearing tank tops.  CSUF ¶ 308.[3]

### III.    Prior Complaints About McConkey

The record is undisputed that, despite his success at mentoring students, Plaintiff was perceived by staff and Churchill administration as having issues with anger management.

On December 10, 2017, Madigan suspended Plaintiff for five days for engaging in unprofessional conduct and violating school policy.  CSUF ¶ 379; Dkt. No. 103 ¶ 46; Dkt. No. 97-7.  The suspension was spurred, in part, by two incidents on November 30, 2017: one in which Plaintiff had a confrontation with five girls who were on the basketball team and another where during an exchange with an elementary school student, Plaintiff stated that that the only Chinese he knew was "General Tso's Chicken."  Dkt. No. 97-9.  Plaintiff claims that the allegations by Wallin against him were false, CSUF ¶ 379, but in his email response to Wallin at the time, he stated, "What you have written is close to what happened," and he added some context to each interaction, Dkt. No. 90-17.

The suspension letter provided to Plaintiff recited five incidents where he had allegedly engaged in unprofessional behavior from April 2016 to November 2017: (1) in April 2016, Plaintiff entered the registrar's office and loudly banged on the cabinets in her office, while yelling loudly; (2) in October 2016, Plaintiff "blew up" at a student who stated that he could not attend art mentoring and then, after being told to reestablish a relationship with the student because the student's parents reported the incident to Wallin, stated to the class that "it looks like someone complained to their parents"; (3) in early September 2017, Plaintiff entered Wallin's office to discuss the need to gain access to the school's Amazon account, and after being told

---

[3] Wallin also referred to McConkey as "institutional memory," which Plaintiff took to be a reference to McConkey's age.  CSUF ¶ 309; RSUF ¶ 309; *see* Dkt. No. 78 ¶ 36.

that Plaintiff would need to go through a department chair to get that access, Plaintiff mumbled something under his breath and then slammed the door behind him; (4) on November 30, 2017, Plaintiff reacted with anger when a number of students on the basketball team informed him that they could not attend a full day of art mentoring because of a basketball game; and (5) also on November 30, 2017, Plaintiff reacted inappropriately when he was confronted by a high school student who accused him of being "a little racist" when he stated to an elementary student that the only Chinese he knew was "General Tso's Chickens." Dkt. No. 97-7 at 2–3. The letter indicated that the five incidents were not exhaustive in nature but represented only "selected situations where [Plaintiff] ha[d] demonstrated difficulty controlling [his] anger." *Id.* at 3. Plaintiff was reminded of the requirement in the Churchill Employee Handbook that Churchill staff "conduct themselves in a professional, courteous manner with students, parents, colleagues and those visiting the school." *Id.* In addition to the five-day suspension, Madigan directed that Plaintiff "participate in and successfully complete an anger management program paid for by Churchill" and warned that "[a]ny further angry outbursts or intimidation of students will result in additional discipline up to and including termination." *Id.* at 4; Dkt. No. 86-15.

On June 16, 2021, Wallin again warned Plaintiff about his conduct at Churchill. Dkt. No. 86-16. Wallin's email identified three concerns:

1. Negativity toward other Churchill professionals needs to stop. Whether that is in the form of speaking ill of other professionals in front of them or behind their back or making people feel uncomfortable about using school supplies, room, or space.

2. Conversations with students need to be appropriate, supportive, and sensitive to emerging learner's needs.

3. When working with assistants, you need to treat them as professionals who deserve to be heard and who play an important role in lesson planning, teaching, and interacting with the students. It is expected that you will mentor your assistants with the ultimate goal of them being able to take on more teaching opportunities within the classroom. You should also be encouraging your

assistants to take on other roles throughout the school as well and making sure they have an important voice in your classroom.

SUF ¶ 92; Dkt. No. 97-8. The email also stated that "if the behaviors reported above were to continue[,] it could result in [Plaintiff's] immediate termination." *Id.*

Plaintiff understood Wallin's June 16, 2021 email to be a serious disciplinary warning, but, despite the language in the email, he disputes that he understood that further inappropriate behavior could result in immediate termination and states that he did not believe he was at risk of imminent firing at that time. SUF ¶ 94; CSUF ¶ 94. On June 17, 2021, Wallin informed Plaintiff that he would not receive a bonus for the 2020-2021 school year due to the concerns shared with him in the email the day before. SUF ¶ 95; Dkt. No. 97-12.

Each year, teachers at Churchill complete a self-evaluation, and their supervisors complete evaluations of their work. CSUF ¶ 251; RSUF ¶ 251. Churchill rates teachers from Level I to Level IV, with Level IV being the highest rating. CSUF ¶ 251; RSUF ¶ 251. In each of the years from 2019 to 2022, Wallin rated Plaintiff at Level III, the second highest rating. CSUF ¶ 253; RSUF ¶ 253. In McConkey's review for 2019, delivered on April 16, 2019, the administration commended him for "a good year in the high school" and noted that the "Art Mentoring Program was a huge success as it always is," that Plaintiff "was an excellent advisor," that he "did a great job of balancing communication with parents and communication with the students," and that he "found a variety of ways to be involved in the life of the school." Dkt. No. 97-16. However, the review also stated that Plaintiff was "coming off a difficult year last year where issues with temperament and professionalism came to a head," and that he "still ha[d] some room to grow before moving to level 4." *Id.* It stated as a goal "making sure to stay professional and avoiding any negative comments about others in the community." *Id.*

In his review for 2020, delivered in the spring of 2020, the school noted that Plaintiff was "one of those rare teachers that have a tremendous impact on the students and the program more generally," that "[h]is involvement in the life of the community [wa]s staggering and his desire to find ways to give back to the community [wa]s truly inspiring," and that he was a "leading voice" on "the DEI front." Dkt. No. 97-17. However, the report also acknowledged his "historic issues arising from his difficulty with anger management," and stated that while Plaintiff "ha[d] made a lot of progress in regard to the anger management issues that he struggled with for so long, [the administration] was not sure that a one year turnaround [wa]s enough to convince his peers that this is the case." *Id.* The reviewer noted, in regard to the criticism from peers, "I think this is fair," and reiterated that the shift in staff perception of Plaintiff would be gradual: "[McConkey] is moving in the right direction and giving people an opportunity to experience a kinder and gentler version of the person they thought they knew." *Id.*

In a review delivered in March 2021, it was noted that the year had been "a particularly challenging one for" Plaintiff with the COVID-19 pandemic requiring adjustment to the usually hands-on nature of his role as an art teacher. Dkt. No. 97-11. It also noted that Plaintiff had "continued to engage in outside reading to further his understanding of DEI issues" and should "[c]ontinue to be mindful of [his] impact on students when discussing topics around DEI." *Id.*

In the review for 2022, delivered on June 6, 2022, Wallin noted "some of the challenges [McConkey] has encountered over the course of his time at Churchill," including in dealing with students and faculty members, and stated that Plaintiff was "showing real growth in areas that would have historically hindered his impact and ability to contribute to the community in the past." Dkt. No. 97-18. While Wallin noted that McConkey had shown progress in "addressing the issues of anger and the treatment of other faculty members in a respectful way," he also

observed that "there have been a few times when students have been negatively impacted by things Dennis has said" and stated that Plaintiff "needs to continue to do some work to make sure this happens less frequently." *Id.* In the self-evaluation portion of the review, Plaintiff acknowledged three "glitches" from the year and stated that "the more you interact with people the more possibilities there is for making a mistake." *Id.* He also stated that "[f]inding a safe balance of bringing this knowledge of our population [in regard to learning disabilities] to grade meetings without sounding like a 'know it all' for lack of a better term or showing any frustration on some faculty members not completely understanding our population or the 'Churchill way' has been something I work on as I believe it takes time to get it." *Id.* Reflecting on Plaintiff's career at Churchill, Wallin noted that "his history of having these types of encounters is not a short one," and "[b]ecause of this, Dennis will have to continue to work hard to overcome both student and Churchill professionals' understanding of these kinds of interactions." *Id.*

On April 22, 2022, Wallin emailed Plaintiff to follow up on a conversation held the day before. SUF ¶ 97; CSUF ¶ 97; Dkt. No. 97-19. In the email, Wallin memorialized expectations for respectful communication, encouraged Plaintiff to route concerns properly, and emphasized that Plaintiff needed to be aware of the impact of his conduct on others. SUF ¶ 98; CSUF ¶ 98; Dkt. No. 97-19. Wallin also advised Plaintiff to be attentive to his tone and to be more professional with students and colleagues. SUF ¶ 99; CSUF ¶ 99; Dkt. No. 97-19.

## IV.    McConkey's Complaint

In September 2021, Plaintiff attended mandatory sexual harassment training at Churchill. CSUF ¶ 341; RSUF ¶ 341. During the training, it was mentioned that one example of harassment is where the harasser repeatedly brings up a prior incident of harassment when talking to the target of the harassment. CSUF ¶ 341; RSUF ¶ 341. Plaintiff immediately thought

9

of Wallin repeatedly mentioning the whiteboard incident.  CSUF ¶ 341; RSUF ¶ 341.  Soon after

the harassment training, Plaintiff spoke with Ashley Greene ("Greene"), Churchill's Director of

Diversity, Equity, and Inclusion, and told her about Wallin making him relive the earlier

harassment year after year.  CSUF ¶¶ 342–43; RSUF ¶¶ 342–43.  According to Plaintiff, Greene

told him that Wallin's conduct was "significant" and not "okay," but took no further action.

CSUF ¶¶ 344, 347; RSUF ¶¶ 344, 347.

On June 14, 2022, Plaintiff sent an email to Bruna, the Assistant Head of School.  SUF

¶ 174; Dkt. No. 90-33; RSUF ¶ 350.  The email stated in pertinent part:

> Hello Annita,
>
> I am sharing this with you because it has been on my mind all year as an example
> of what it feels like to be here and I feel like I can trust you to be confidential[.]
>
> In 2001 a student came into my room upset about something that was written on
> the dry erase board in Jason Wallin's classroom on the seventh floor.  The student
> said that it has been there all day and that I should go see it.  I want [sic] up stairs
> and saw written the board, "Dennis is a f*cking fag".  I asked Jason Wallin why he
> hadn't erased it.  He said he didn't notice it or some such thing.
>
> It is many years ago and it should be water under the bridge except for the fact that
> since Jason Wallin has taken on an administrative role and is responsible for my
> reviews he brings up how afraid he was of me during that situation from over twenty
> years ago.  He took my harassment and made it about himself in the moment and
> uses the situation surrounding my harassment making me relive it every year.  I
> only really understood what this was this year during our orientation mandatory
> harassment training when the training gave a similar situation as an example.  It
> was at this point I realized what was happening to me at my workplace, every year
> I am confronted with the fact I was harassed and it has been turned on me both
> discounting my having been the victim of harassment as well as forcing me to be
> reminded of it as a power play by not only a coworker but a supervisor.
>
> . . .
>
> At this year's review, which was mostly very complimentary and thankful, he did
> manage to find a place to body shame me by saying that my size is "intimidating".
> Referring to one being the "institutional memory" it can be perceived as code for
> old.

> Soon after I had the experience with the harassment training I spoke with Ashley Greene Director of Diversity who let me know that it is significant and "isn't okay". When we discuss the idea of intersectionality, which is a term developed for legal matters, my experience at Churchill can be framed in homophobia, body shaming, and ageism, none of which is okay. Again, I am sending this to you to have on record that I have brought it to an administrator. I'm not one to be litigious or to attack somebody's career but I also feel like somebody needs to know this.

Dkt. No. 90-33; RSUF ¶ 350.

The evidence is somewhat disputed regarding the follow-up to the email. It is undisputed that within a day of receiving the June 14, 2022 email, Bruna approached Plaintiff in person in the school lobby, acknowledged that she had read the email, and asked to discuss it, but Plaintiff claims also that Bruna stated that she did not want to discuss the complaint at that time, and that they should find another time to talk. SUF ¶ 182; CSUF ¶¶ 182,352; RSUF ¶ 352. He states that Bruna never followed up with him. CSUF ¶ 352. He also claims that he tried to speak to Bruna several times but that whenever he went to her office, he was told Bruna was unavailable. *Id.* ¶ 353. Bruna testified that she followed up with Plaintiff within a day of receiving the email but Plaintiff declined to speak to her and said there was nothing to be done. RSUF ¶ 352.

The school year ended three days after Plaintiff sent the June 14, 2022 email, and he did not work at Churchill over the summer recess. SUF ¶ 192; CSUF ¶ 192.

Bruna discussed the June 14, 2022 email with Madigan and showed it to him a couple of weeks after she received it. CSUF ¶¶ 355–56; RSUF ¶¶ 355–56. On August 2, 2022, Bruna printed out a copy of the email and gave it to Madigan. CSUF ¶ 368; RSUF ¶ 368.

## V.    The Bathroom Incident and the School's Investigation

Plaintiff returned for the next school year. On October 18, 2022, when Plaintiff took attendance for his class, he realized that two students in his class were absent. SUF ¶ 107; CSUF ¶ 386. Other students said the two students must have gone to the bathroom. SUF 107; RSUF ¶ 386. After about fifteen minutes, Plaintiff went to look for the missing students and discovered

11

that they were not in the hallway. CSUF ¶ 388. He then went to the girls' bathroom to find the students. SUF ¶ 108; CSUF ¶ 389.

What happened next is disputed. Defendant claims that Plaintiff kicked the door of the bathroom open. SUF ¶ 110. Plaintiff does not dispute that he opened the door with his leg, but he characterizes the conduct differently. He claims that he used the toes on one foot to push the door open a few inches and to call for one of the students. CSUF ¶ 389. He asserts that he leaned back as he pushed the door open because he did not want to be looking into the girls' bathroom, and that one of the students then opened the door wide enough for him to see her face. *Id.* ¶¶ 389–90. Plaintiff asked if the other student was also in the bathroom, and he was told that she was. *Id.* ¶ 391. It is undisputed that the student also told him that a third student, who was not in Plaintiff's class, had "flown across the room" or "flew across the floor" when Plaintiff pushed open the door. SUF ¶ 111; CSUF ¶ 391.[4] Plaintiff directed the students to return to class and one of the students then followed Plaintiff back to the classroom. CSUF ¶¶ 393–94. After Plaintiff returned to the classroom, he also asked his teaching assistant, Shanna Iglesias ("Iglesias"), to check on the second student who had not yet returned to the classroom. *Id.* ¶ 395. Ultimately, the second student returned to the classroom toward the end of the class with a fourth student who was in Plaintiff's next class. *Id.* ¶ 397.

Bruna was informed of the incident near the end of the school day when two school professionals informed her that a student reported being struck by a door that was kicked by Plaintiff. SUF ¶ 117; CSUF ¶ 117. After Bruna viewed and recorded videos from the school surveillance cameras of the incident, she texted Madigan to see if he was free to speak and

---

[4] Plaintiff denies that he was told that the student "flew across the floor," and claims instead that he was told the student "flew across the room." SUF ¶ 111; CSUF ¶ 391. The difference is immaterial.

attached the footage from the surveillance cameras that she recorded on her cellphone. SUF ¶ 121; CSUF ¶¶ 121, 398; RSUF ¶ 398; Dkt, No. 97-14. Bruna and Madigan spoke by telephone and discussed placing Plaintiff on suspension. SUF ¶ 122. Madigan also informed Wallin of the surveillance video and that the incident would be investigated. SUF ¶ 123; CSUF ¶ 123. That evening, Madigan sent an email to Plaintiff informing him that Churchill was aware of the incident and that Plaintiff was suspended pending an investigation. SUF ¶ 124; CSUF ¶¶ 124, 401; RSUF ¶ 124.

As the most senior administrator on site at Churchill on October 18, 2022, Bruna led the ensuing investigation. SUF ¶ 126; CSUF ¶ 126. Wallin also participated in the investigation. SUF ¶ 125; CSUF ¶ 125. Bruna interviewed student and employee witnesses on October 18 and 19, 2022. SUF ¶ 127; CSUF ¶ 127. Wallin joined for the interviews on October 19. SUF ¶ 128. The two, plus Madigan, also interviewed McConkey. *Id.* ¶ 136; CSUF ¶ 136. One student, whom the Court refers to as Student A, reported to Bruna that she was standing in the restroom when the door forcefully opened, causing her to be "jolted" and sent "flying," and that when she informed Plaintiff that he needed to be careful, Plaintiff responded that she should not have been in the bathroom. SUF ¶ 129; CSUF ¶ 129. A second student, Student B, reported hearing the door slam open and that when she returned to class, Plaintiff yelled at her. SUF ¶ 130. A third student, Student C, told Bruna that she observed Plaintiff kick the door and heard another student tell Plaintiff that the door had struck her. *Id.*¶ 131. Student C also reported that when they returned to class, she reminded Plaintiff that he had kicked the door open, and Plaintiff responded by saying that she was not a doctor or a therapist. *Id.*[5] Plaintiff's assistant Iglesias

---

[5] Plaintiff asserts that these statements are inadmissible hearsay. CSUF ¶¶ 130–31. But the Court considers them "not for the truth of the matters asserted therein" but for the contents of what Bruna was told and "the fact that the statements were made." *See Oklahoma Firefighters*

told the interviewers that she arrived about ten minutes into the third period, that Plaintiff expressed concern to her about students out of class, that he went to check the bathroom, and that when he returned, he stated that the students were "having a party" and later acknowledged that he "just kicked in the door to see what was going on." SUF ¶¶ 132–34; CSUF ¶¶ 132–34; *see generally* Dkt. No. 90-29 (Bruna investigation notes). The investigators also reviewed Bruna's preserved cellphone recording of the surveillance footage which they concluded showed Plaintiff kicking the door. SUF ¶ 135; CSUF ¶ 135.

Bruna was also informed by the reports that she received from the two professionals who first reported the incident to her on the day it occurred, as well as by the interviews of a total of five Churchill employees, including, in addition to Iglesias, former Assistant Teacher Hilary Van Santen, Patricia Mensa, Sarah Coladroz, and Dylan Bryant. CSUF ¶ 138; Dkt. No. 90-4 at 201, 203, 230; Dkt. No. 103 ¶ 93; Dkt. No. 90-29 at 2, 7–8, 11–15. The two professionals who initially reported the incident to Bruna were Dylan Bryant ("Bryant") and Sarah Coladroz ("Coladroz"). Coladroz was the interim DEI director, and Bryant was an eleventh grade chemistry teacher and the equity coordinator. Dkt. No. 90-4 at 200–201. They reported that Bryant had received a report from Student A, who was in his class and who was his advisee, that she had been struck by a door that was kicked by Plaintiff. Dkt. No. 90-4 at 201. Student A indicated that she had received permission from Bryant to go to the bathroom and that, when she returned to class after having been struck, she recounted the incident and said that she needed to report a teacher. Bryant also reported that the other students who were in the bathroom at the

---

*Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 557 n.1 (S.D.N.Y. 2018), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019) (summary order).

time had spoken to the high school social worker (who was a mental health professional) and other teachers following the incident. *Id.* at 202.

During Bruna's interviews with staff, she took notes about conversations they had with the students involved in the incident. She first spoke with Hilary Van Santen ("Van Santen"), who relayed that the students were upset about Plaintiff and told her that while they were in the bathroom during third period, Plaintiff kicked the door, which hit Student A, who flew backwards. Dkt. No. 90-29 at 2. Student A was in Bryant's chemistry class at the time, and Student B and Student C were in Plaintiff's art class. Van Santen told Bruna that Student A looked outside of the bathroom and saw Plaintiff, "irate and yelling at them to get back to class." *Id.* Bruna then met with Coladroz and Bryant, who stated that Student A left chemistry class and went to the bathroom, where she saw Student B and Student C. Bruna noted that the two told her that Plaintiff "went to find his missing students" and "kicked the door and hit [Student A's] back, sent her flying and stop [sic] on the stall." *Id.* Student A told Plaintiff that he hit her with the door and he "responded by saying it doesn't matter. None of you should be here." *Id.* Student A informed Plaintiff that she had permission to be in the bathroom and he did not apologize to her or acknowledge that he had hit her with the door. *Id.*

Bruna next interviewed Patricia Mensa, who told Bruna that three students were in the bathroom, Plaintiff kicked the door of the bathroom and "sent [Student A] flying," and when that student "[stood] up for herself," Plaintiff "yell[ed] back." *Id.* A few days later, Bruna met with Van Santen again, who "wanted to provide some historical context" to interactions with Plaintiff and informed Bruna of inappropriate comments Plaintiff had made to herself and other teaching assistants. *Id.* at 7–8, 11–15.

On October 20, 2022, Bruna, Wallin, and Madigan interviewed Plaintiff as part of their investigation and provided him with an opportunity to respond to the allegations. SUF ¶ 136; CSUF ¶ 136. When Plaintiff was interviewed, he told Madigan, Bruna, and Wallin that he had tapped the door open a few inches so that his voice could be heard inside the bathroom. Dkt. No. 103 ¶ 90; Dkt. No. 97-13 at 7. He also stated that Iglesias did not arrive to the classroom until after Plaintiff had returned from checking on the students in the bathroom. Dkt. No. 103 ¶ 85.

On October 21, 2022, Bruna conducted a follow-up interview with Student A, who confirmed that she saw Plaintiff at the bathroom door and asked him, "Was that you?" in reference to the door opening. Dkt. No. 90-29 at 9. According to Student A, Plaintiff responded, "Yeah I just kicked the door, you shouldn't be in here." *Id.*; SUF ¶ 137. Student A also stated that Plaintiff offered no apology and expressed no concern for their welfare. SUF ¶ 137.

On October 24, 2022, Madigan scanned to his email address a copy of the June 14, 2022 email that Bruna had printed for him in August 2022. CSUF ¶ 410; RSUF ¶ 410. Madigan testified that as of October 26, 2022, he had come to a decision to terminate Plaintiff's employment. Dkt. No. 90-3 at 259:2–5.

## VI.    McConkey's Termination

After the interviews were complete, Madigan met in his office with Bruna and Wallin to decide whether to terminate Plaintiff's employment. SUF ¶ 141; Dkt. No. 90-3 at 251–53; Dkt. No. 90-2 at 234–35. Madigan testified that his "first inclination [to fire Plaintiff] was when [he] saw the video." Dkt. No. 90-3 at 250:8–9. He noted that in light of "the history that we have of [Plaintiff's] behaviors" and that Plaintiff had "been through anger management already and had been on notice that further behaviors could lead to termination," "this, to [him,] was the last straw." *Id.* at 250:9–21. Madigan testified that it was then further "troubling" to him that "when [he, Bruna, and Wallin] met with [Plaintiff], [] there was no indication of remorse, or indication

that possibly he could have done things differently." *Id.* at 250:21–25.  Madigan testified that following the interview with Plaintiff, there was not an immediate consensus to terminate Plaintiff's employment, but instead they "took some time, reached out to counsel again." *Id.* at 253:2–4.  Madigan testified that he and Bruna were leaning towards termination, but no decision was made that day. *Id.* at 252:21–25.

Wallin initially did not agree that Plaintiff's employment should be terminated for fear of losing a good teacher, but Madigan testified that Wallin ultimately agreed with the decision, believing that "[the bathroom incident was] kind of the last straw with everything that had been put into Dennis over the years."  Dkt. No. 90-3 at 251:21–252:11.  Although Madigan was the ultimate decisionmaker with respect to Plaintiff's termination, SUF ¶ 141, all three parties were in agreement with the decision, Dkt. No. 90-2 at 235–37; Dkt. No. 90-4 at 257.  There is no evidence that the parties considered McConkey's June email to Bruna in reaching a decision to fire him.  *See* Dkt. No. 90-2 at 237:18–22 (Wallin testifying, "No, that didn't come up at all"); Dkt. No. 90-4 at 256:24–257:7 (Bruna testifying that the email was not discussed "[a]t any point in October 2022").

On October 27, 2022, Plaintiff was directed to report to Churchill to attend a meeting with Madigan.  SUF ¶ 142; CSUF ¶ 411.  The meeting lasted fewer than three minutes.  CSUF ¶ 412; RSUF ¶ 412.  At the meeting, he was informed that his employment was terminated, and he was provided with severance documents and a written termination letter.  SUF ¶ 143; CSUF ¶ 412.  The letter stated:

> Dear Dennis,
>
> I write to inform you that you are terminated from employment at Churchill School and Center, effective immediately, as a result of your unprofessional behavior towards both students and colleagues and your failure to modify that behavior after numerous warnings.

The most recent incident occurred last week when you angrily confronted two students who had left your classroom without permission by kicking the girls' restroom door open with such force it knocked a student into the sink.  Although you explained that your behavior in seeking out the students was out of concern for their safety and mental health, that explanation is belied by the fact that you did not apologize or even acknowledge to the one student that she could have been injured by the force of the door.  The situation was exacerbated by your defensive attitude when you returned to the classroom and challenged one of the students about what had occurred in hearing distance of the rest of the class.  Based upon our investigation, there is sufficient evidence to conclude that you  engaged in conduct that violated Churchill's standards of conduct and expectations.

Unfortunately, there is a history of this type of inappropriate conduct.  In December of 2017, you were suspended without pay as a result of unprofessional outbursts of anger and intimidation of students.  By letter dated December 10, 2017, you were told that further angry outbursts or intimidation of students would lead to discipline, up to and including termination.  Again, on June 16, 2021, you were counselled about your unprofessional behavior and inappropriate conversations with staff and students.  That correspondence stated that if any inappropriate behaviors were to continue, it could result in immediate termination.

Your behavior towards students and your colleagues is inexcusable.  Churchill can no longer tolerate your failure to control your temper and maintain appropriate decorum with both students and staff.

It is with regard that I take this action.  I wish you the best in your future.

Dkt. No. 77-12.  Plaintiff was able to read the termination letter at the meeting and did not dispute it.  SUF ¶ 146; CSUF ¶ 146.  The decision was not a surprise; Plaintiff expected to be terminated at the October 27 meeting.  SUF ¶ 147; CSUF ¶ 147.

Plaintiff was replaced by his former Assistant Teacher Hilary Van Santen, who is not a gay man and who never accused Churchill of discrimination or retaliation.  CSUF ¶ 420; RSUF ¶ 420.  Wallin testified that Van Santen was chosen because she was highly qualified, had a degree in art, had substantial experience as an assistant teacher at Churchill, and was familiar with Churchill's students and its population.  RSUF ¶ 420; Dkt. No. 90-2 at 263:14–21.

Plaintiff did not bring any concern to Madigan before his termination.  SUF ¶ 198; CSUF ¶ 198.

18

**PROCEDURAL HISTORY**

This case was initiated by complaint filed on August 12, 2024. Dkt. No. 1. Plaintiff alleged claims for age and sexual orientation discrimination and retaliation under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 291 and 296, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101 and 9-10. *Id.*

Defendant moved to dismiss the complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim for relief. Dkt. No. 11. On July 23, 2025, the Court issued an opinion and order granting in part and denying in part Defendant's motion to dismiss. Dkt. No. 33; *McConkey v. Churchill Sch. & Ctr.*, 2025 WL 2062195 (S.D.N.Y. July 23, 2025). The Court dismissed Plaintiff's claims for age discrimination under the ADEA, NYSHRL, and NYCHRL, and denied the motion as to Plaintiff's claims for age-related retaliation under the ADEA, NYSHRL, and NYCHRL, and sex-related discrimination and retaliation under Title VII, NYSHRL, and NYCHRL. Dkt. No. 33 at 35.

On February 20, 2026, Defendant filed this motion for summary judgment. Dkt. No. 85. It also filed a memorandum of law in support of the motion, a Local Rule 56.1 statement, the affidavit of Annita Bruna, and the declaration of Rebecca K. Kimura attaching exhibits. Dkt. Nos. 86–90. On March 19, 2026, Plaintiff filed a memorandum of law in opposition to the motion for summary judgment. Dkt. Nos. 101, 110. Plaintiff also filed a counter-statement to Defendant's Local Rule 56.1 statement and declarations from the following individuals in opposition to the motion for summary judgment: Anne L. Clark, Dennis McConkey, Annalisa Fratantoni, Sophie Orenstein, Aidan Conley, Gray Parker, and Sue Fishkin. Dkt. Nos. 102–109, 111–14.

19

Also, on February 20, 2026, Plaintiff filed his motion for sanctions and a supporting memorandum of law and the declarations of Anne L. Clark, Dennis McConkey, Annalisa Fratantoni, and Brandon White.  Dkt. Nos. 75–83.  On March 19, 2026, Defendant filed a memorandum of law in opposition to the motion for sanctions, as well as the declaration of Rebecca K. Kimura and the affidavit of Tim Madigan.  Dkt. Nos. 95–98.

On March 25, 2026, Defendant filed a motion for leave to file an answer out of time. Dkt. No. 115.  Plaintiff filed a letter response in opposition to the motion on March 27, 2026. Dkt. No. 116.

## DISCUSSION

### I.    Plaintiff's Motion for Sanctions

Plaintiff seeks jury instructions that "Defendant intentionally destroyed video footage; and that the destroyed video footage would have been unfavorable to Defendant," as sanctions based upon what he claims was Defendant's intentional spoliation under Rule 37(e)(2), and he argues that such an inference alone is sufficient to defeat summary judgment.  Dkt. No. 82 at 17–18.  In the alternative, Plaintiff seeks sanctions under Rule 37(e)(1) in the form of an order permitting him to present evidence concerning Defendant's failure to preserve relevant video footage plus reasonable attorneys' fees and costs incurred in bringing the spoliation sanctions motion.  *Id.* at 19–21.

### A.    The Relevant Facts

The relevant facts are not substantially in dispute.[6]  Bruna learned of the incident after it was brought to her attention on the afternoon of October 18, 2022 by the on-site school

---

[6] On a motion for spoliation sanctions under Rule 37, the Court acts as the finder of fact.  *See Hoffer v. Tellone*, 128 F.4th 433, 441 (2d Cir. 2025) ("[O]ne of the district court's roles in resolving a motion for sanctions is to act as factfinder." (quoting *Rossbach v. Montefiore Med. Ctr.*, 81 F.4th 124, 139–40 (2d Cir. 2023))).

professionals.  SUF ¶ 116; CSUF ¶ 116; Dkt. No. 83-3 at 200:8–18.  She brought it to the attention of Madigan, who brought it to the attention of Wallin.  SUF ¶¶ 121–23; CSUF ¶¶ 121–23.

There are two security cameras in the hallways near McConkey's classroom and the girls' bathroom.  Dkt. No. 83-3 at 207:21–23.  On the afternoon of the incident, after school ended, Bruna went to the room where footage from the security cameras was stored and asked the plant manager to pull up the recordings of the incident at the school.  *Id.* at 204:19–205:16; SUF ¶ 118; CSUF ¶ 118.  She then used her cellphone to record the portions of the video that showed McConkey kicking the door.  Dkt. No. 83-3 at 206:17–19; SUF ¶ 119; CSUF ¶ 119.  Bruna took two recordings because there were two different cameras with different angles.  Dkt. No. 83-3 at 207:18–208:11.  She did not ask that the raw footage be preserved because "[Churchill] [doesn't] do that," and "[she'd] never asked to do that before."  *Id.* at 208:17–18.  According to her, "[staff at Churchill] usually use [their] phones and collect what [they] need in that moment and [she didn't] use the cameras beyond that."  *Id.* at 208:18–20.  She did not capture the students entering or leaving the bathroom.  *Id.* at 209:2–3.

On November 2, 2022, McConkey's lawyers sent a letter to the lawyer whose name was in the separation agreement provided to McConkey on the day his employment was terminated.  McConkey's letter asked Churchill to preserve documents.  The letter stated, in part:

> [W]e expect Churchill to preserve all documents, including handwritten and electronic data, relating to Mr. McConkey; his employment; any alleged complaints about him; any purported investigations; and any communications about his or his departure.  In particular, we understand that there is a security camera pointed toward the girls' bathroom where the alleged events of October 18, 2022 took place. Please take steps immediately to preserve video from that day.

Dkt. No. 77-13.

21

Madigan received a copy of the letter on November 2 or 3, 2022.  Dkt. No. 83-2 at 308:25–309:4.  Madigan instructed Bruna to preserve the clips of the footage she filmed with her cellphone.  *Id.* at 309:5–310:3.  Madigan did not take any steps to secure the original video because the school had the recordings from Bruna's phone.  *Id.* at 309:25–310:3.  He explained that he did not take additional steps "[b]ecause the way [Churchill] typically recorded videos like that via a cell phone, is what [Churchill] had done and [Churchill] had no reason to believe that [they] needed to do that otherwise."  *Id.* at 310:5–9.

McConkey filed his EEOC charge on December 27, 2022.  Dkt. Nos. 77-7; 77-14.  He filed this action on August 24, 2024.  Dkt No. 1.

On January 17, 2025, Plaintiff served his First Request for Production of Documents.  The First Request included a request for, *inter alia*, "all surveillance footage taken of [Churchill] hallways on October 18, 2022 that covered or were near the girls' bathroom, Plaintiff's classroom and the areas between the bathroom and the classroom."  Dkt. No. 77-24.

Churchill's Employee Handbook requires that "[i]f documents, emails or phone records are relevant to [a harassment] investigation, steps will be taken to obtain and preserve them."  Dkt. No. 77-9 at 5.[7]

The security footage in its native and complete format was not preserved.  Dkt. No. 76 at 8.  Churchill's security footage is "typically overridden within 14 days or less."  *Id.*  The original footage was thus likely destroyed by November 1, 2022.  *Id.*

### B.    Analysis

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."

---

[7] Citations to this docket entry use ECF pagination.

22

*ELG Utica Alloys, Inc. v. Niagara Mohawk Power Corp.*, 144 F.4th 360, 374 (2d Cir. 2025) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)); *accord Oakley v. MSG Networks, Inc.*, 792 F. Supp. 3d 377, 383 (S.D.N.Y. 2025) (Sullivan, J.). "A party seeking sanctions for spoliation has the burden of establishing the elements of a spoliation claim." *Leidig v. Buzzfeed, Inc.*, 2017 WL 6512353, at \*7 (S.D.N.Y. Dec. 19, 2017) (citing *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 109 (2d Cir. 2001)).

Federal Rule of Civil Procedure 37(e) governs claims of spoliation from the loss of electronically stored information ("ESI"). Rule 37(e) states that "[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery," the court may award sanctions in accordance with subsections (1) or (2). Fed. R. Civ. P. 37(e). Rule 37(e) then divides sanctions into two categories:

> (1) upon finding prejudice to another party from loss of the information, [the Court] may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation [the Court] may:
>
>> (A) presume that the lost information was unfavorable to the party;
>>
>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>>
>> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

Thus, "Rule 37(e) requires a 'three-part inquiry'":

> The first is to decide if the rule applies at all—that is, if a party failed to take 'reasonable steps' to preserve electronically stored information 'that should have been preserved in the anticipation or conduct of litigation.' Fed. R. Civ. P. 37(e). If so, then the second step is to decide if there has been 'prejudice to another party from loss of the information,' in which case the Court 'may order measures no greater than necessary to cure the prejudice.' Fed. R. Civ. P. 37(e)(1). Lastly, the

third step to consider—regardless of prejudice to any other party—is whether the destroying party 'acted with the intent to deprive another party of the information's use in the litigation,' in which event a court may consider whether to impose the most severe of measures such as mandatory presumptions or instructions that the lost information was unfavorable or the entry of default judgment.

*Karsch v. Blink Health Ltd.*, 2019 WL 2708125, at *13 (S.D.N.Y. June 20, 2019) (quoting *Coan v. Dunne*, 2019 WL 1620412, at *6 (D. Conn. Apr. 16, 2019)).

Said differently, the threshold requirements for the imposition of spoliation sanctions are: "(1) that relevant ESI existed; (2) that the ESI should have been preserved in anticipation of litigation; (3) that the allegedly spoliating party did not take reasonable steps to preserve the ESI; and (4) that the ESI cannot be entirely restored or replaced." *Castro v. Smith*, 2023 WL 5371311, at *7 (S.D.N.Y. Aug. 22, 2023).

"[A] party's obligation to preserve evidence 'arises when the party has notice that the evidence is relevant to the litigation or when a party should have known that the evidence may be relevant to future litigation.'" *Karlyg v. City of New York,* 2024 WL 4333858, at *5 (E.D.N.Y. Sept. 28, 2024) (quoting *Fujitsu Ltd. v. Federal Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)). "Once the duty to preserve evidence attaches, a party must save any evidence that it 'reasonably should know is relevant' to an anticipated action." *Taylor v. City of New York,* 293 F.R.D. 601, 611 (S.D.N.Y. 2013) (quoting *Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212, 217 (S.D.N.Y. 2003)). "If triggered, the preservation obligation requires a litigant to do more than refrain from intentionally destroying relevant evidence; the litigant must also 'take affirmative steps to prevent inadvertent spoliation.'" *Skyline Steel, LLC v. PilePro, LLC*, 101 F. Supp. 3d 394, 408 (S.D.N.Y. 2015) (quoting *R.F.M.A.S., Inc. v. So,* 271 F.R.D. 13, 24 (S.D.N.Y.2010)). In particular, "[o]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Castro*, 2023 WL 5371311, at *10 (quoting *Zubulake*, 220

24

F.R.D. at 218).  "[T]he duty to preserve extends to those employees likely to have relevant information—the 'key players' in the case." *Zubulake*, 220 F.R.D. at 218; *accord In re Correra*, 589 B.R. 76, 133 (Bankr. N.D. Tex. 2018).

There is no dispute that the full video depicting the students entering and exiting the bathroom no longer exists and that it cannot be restored or replaced.  Moreover, by no later than October 27, 2022, Churchill was on notice that litigation was reasonably anticipated.  Van Santen had told Bruna shortly before McConkey was fired that McConkey would sue Churchill if fired, and Churchill had made the decision to terminate McConkey's employment by October 27, 2022.  Dkt. No. 97-4 at 193:7–10.  McConkey's June 14, 2022 email had made clear that he had an attorney with whom he had discussed his concerns regarding discrimination.  Dkt. No. 90-33 (noting that Plaintiff spoke to his lawyer about Wallin denying his bonus in 2021).  Wallin himself testified that, at the time of McConkey's firing, he believed that McConkey would assert legal claims against Churchill.  CSUF ¶ 419; RSUF ¶ 419; Dkt. No. 90-2 at 281:2–11.  Those facts are sufficient to have put Defendant on notice of the likelihood of litigation.  Churchill need not have received a written letter from counsel in order to have anticipated that McConkey would sue.  *See PDV USA Inc. v. Interam. Consulting Inc.*, 2026 WL 203036, at *11 (S.D.N.Y. Jan. 27, 2026) (where single member of firm "admitted that he actually did anticipate litigation," the obligation to preserve evidence attached, even where other evidence was "too vague to identify when [defendant] should have first reasonably anticipated litigation"); *see Bistrian v. Levi*, 448 F. Supp. 3d 454, 468 (E.D. Pa. 2020) (in determining whether litigation is reasonably anticipated, "courts consider a variety of factors, including the type and seriousness of the injury; how often similar kinds of incidents lead to litigation; the 'course of conduct between the parties, including past litigation or threatened litigation'; and what steps the parties took after the

25

incident and before the loss of the evidence, including whether the defendant initiated an investigation into the incident").

It was at that point, when Churchill made the decision to terminate McConkey's employment and when it could have anticipated that he would sue, that Churchill should have preserved the full video of the incident, including the images of the girls entering and exiting the bathroom. "The first element of the traditional spoliation test . . . requires the moving party to demonstrate that the spoliating party 'had an obligation to preserve [the evidence] at the time it was destroyed.'" *Leidig*, 2017 WL 6512353, at *8 (quoting *Byrnie*, 243 F.3d at 107). "Identifying the boundaries of the duty to preserve involves two related inquiries: *when* does the duty to preserve attach, and *what* evidence must be preserved?" *Zubulake*, 220 F.R.D. at 216 (emphasis in original). "A party that 'reasonably anticipates litigation' must maintain all evidence that they knew or 'should have known . . . may be relevant' to that litigation." *Kosmidis v. Port Auth. of N.Y. & N.J.*, 2020 WL 5754605, at *4 (S.D.N.Y. Aug. 27, 2020), *report and recommendation adopted*, 2020 WL 7022479 (S.D.N.Y. Nov. 30, 2020) (quoting *Fujitsu Ltd.*, 247 F.3d at 436). The boundaries of the duty to preserve are not set by what a party believes is sufficient for its internal investigation. "[W]hen determining what video footage, if any, should be preserved in relation to the altercations at issue in this case, the obligation to preserve all relevant evidence required the defendants who had control of the footage not just to ascertain and preserve the evidence that is relevant for their purposes, but also the evidence that could be relevant for [McConkey's] purposes." *Thomas v. Butkiewicus*, 2016 WL 1718368, at *11 (D. Conn. Apr. 29, 2016). The portions of the videotape that were retained show McConkey opening the door with his leg and foot and then shifting backwards from the impact on the door. They do not show the girls entering or leaving. At a minimum, it would have been relevant to

know whether the girls were in the bathroom and thus were in a position to observe what they later told school authorities.  Thus, Defendant should have preserved more of the surveillance footage than just McConkey's actions.

"[T]he mere fact that deleted materials were relevant does not itself establish prejudice." *Pugh-Ozua v. Springhill Suites*, 2020 WL 6562376, at *4 (S.D.N.Y. Nov. 9, 2020).  "Standing alone, th[e] threshold finding [that deleted evidence was relevant] cannot also satisfy the separate 'prejudice' requirement of subsection (e)(1)." *Karsch*, 2019 WL 2708125, at *20.  To order spoliation sanctions, the Court still must find either that the moving party has suffered prejudice from the loss of the destroyed evidence or that the non-moving party "acted with the intent to deprive another party of the information's use in the litigation."  Fed. R. Civ. P. 37(e). McConkey has established neither.

Rule 37 "does not place a burden of proving or disproving prejudice on one party or the other," but rather "leaves judges with discretion to determine how best to assess prejudice in particular cases."  Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment.  A party may establish prejudice by showing "that the evidence was not only probative, but that it would affirmatively support the movant's claim."  *Ungar v. City of New York*, 329 F.R.D. 8, 15 (E.D.N.Y. 2018).  The court need not find that there exists a "smoking gun . . . it is sufficient if the existing evidence plausibly 'suggests' that the spoliated ESI could support the moving party's case."  *Karsch*, 2019 WL 2708125, at *21; *accord Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47, 66 (S.D.N.Y. 2020).  "The prejudiced party must not be held 'to too strict a standard of proof regarding the likely contents of the destroyed or unavailable evidence,' because doing so 'would allow parties who have destroyed evidence to profit from that destruction.'"  *Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 580 (S.D.N.Y.

27

2017) (quoting *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F.
Supp. 2d 456, 468 (S.D.N.Y. 2010)).  Prejudice may also be established in some cases "where a
party destroys the only evidence that might vindicate their opponent's claims and thereby assures
victory for themselves."  *Ungar*, 329 F.R.D. at 15.

Plaintiff argues that Defendant's spoliation prejudiced him because the missing portions
of the videotape "may show not only that witnesses to the bathroom incident were not truthful,
but could undermine the credibility of Bruna," including by showing that she did not record and
preserve the portions of the video that show the girls entering or exiting the bathroom.  Dkt. No.
76 at 19.  Plaintiff does not dispute that the surveillance cameras would not have videotaped
what happened inside the bathroom and whether, in fact, Plaintiff's actions had the impact inside
the bathroom that the students asserted that they had.  The cameras depicted the bathroom from
the outside.  Rather, Plaintiff argues that "the surveillance cameras would have captured students
entering and exiting the bathroom and would have shown when Iglesias arrived at McConkey's
classroom," and that the "[s]tudents' demeanor upon exiting the bathroom [would] bea[r]
directly on their credibility, and the timing of Iglesias's arrival would resolve whether she
truthfully reported being present before McConkey checked on the students."  Dkt. No. 125 at 8–
9.  But the issues Plaintiff identifies are almost entirely immaterial.  With respect to the bathroom
incident, the school based its decision on the conclusions that McConkey kicked the bathroom
door open, that he did so with "such force that it knocked a student into the sink," that he did not
apologize to the students or acknowledge what had happened, and that afterwards he challenged
one of the students in the classroom.  Dkt. No. 77-12.  The decision was not based on the
students' appearance after McConkey had kicked the door open and whether they were
distraught or not.

Plaintiff admits that the portion of the tape recorded by Bruna captured the entire interaction he had at the bathroom.  Dkt. No. 86-1 at 271:10–12, 274:11–14.  He also does not dispute that the girls were in the bathroom and thus in a position to have been hit by the swinging door when Plaintiff kicked it.  Dkt. No. 109 ¶ 111.  Plaintiff had the opportunity to review the notes of the interviews of the students during discovery and to take their depositions, if he had sought to, regarding what happened in the bathroom.  Whether they were smiling or giggling or frowning when they exited the bathroom would not show whether Defendant had kicked the door open and would have only the most tangential relevance, if that, to whether the kick had impacted the students in the bathroom.  And Plaintiff does not contend that the surveillance videos would have captured his conduct inside the classroom.  To the extent it would be relevant that Bruna recorded only McConkey's conduct in kicking the door of the bathroom and not the girls exiting or entering the bathroom, Plaintiff would be free to explore at a trial the evidence that Churchill has presented and that which it could have preserved but did not.  He does not need spoliation sanctions to identify gaps in the evidence—if the failure to capture the students entering or exiting the bathroom could even be characterized as gaps.  Churchill made its decision based on the portions of the video that were recorded by Bruna.  Plaintiff has not shown, nor can the Court find, that the portions that she did not record would be at all helpful or even relevant to Plaintiff's case.[8]

McConkey also has not demonstrated an intent to deprive.  "[T]he intent contemplated by Rule 37[(e)(2)] is not merely the intent to perform an act that destroys ESI but rather the intent to actually deprive another party of evidence."  *Karsch*, 2019 WL 2708125, at *22 (citation

___

[8] Whether Igelsias had entered the classroom before McConkey went searching for the students is irrelevant.  A recording that contradicts Iglesias's statement of when she entered the classroom has no influence on the impact of her statements on Churchill, which is the material issue here.

omitted); *see Barbera v. Grailed*, 2025 WL 2098635, at *8 (S.D.N.Y. July 25, 2025). "A court may infer that a party acted with an intent to deprive on the basis of circumstantial evidence." *Castro*, 2023 WL 5371311, at *11. "If an intent to deprive is found, no separate showing of prejudice is required, because the finding of intent to deprive supports an inference that the opposing party was prejudiced by the loss of information." *Matthews v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 2023 WL 2664418, at *14 (N.D.N.Y. Mar. 28, 2023). "Although Rule 37(e)(2) does not specify the standard by which the 'intent to deprive' must be established, it is appropriate, given the severity of the sanctions permitted under that provision of the Rule, for the intent finding to be based on clear and convincing evidence." *Lokai Holdings LLC v. Twin Tiger USA LLC*, 2018 WL 1512055, at *8 (S.D.N.Y. Mar. 12, 2018). Courts in this District have held that "a party may be found to have acted with the intent to deprive where (1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator." *Charlestown Cap. Advisors, *, 337 F.R.D. at 66–67.

Plaintiff does not satisfy that standard. The evidence does not establish that Defendant would have understood the evidence to have been material at any time before it was automatically destroyed or that Defendant understood there was a duty to preserve the evidence. Churchill follows a consistent practice of recording the relevant portions of videos by cellphone. Dkt. No. 83-3 at 208:18–20. It followed that policy. There is no evidence that it employed a practice that differed from the ordinary in order to deprive Plaintiff of evidence in this case. Nor

30

is there any other evidence that Defendant took action to destroy relevant evidence.  To the contrary, not only did Defendant preserve the videotapes on Bruna's phone, but it also preserved the notes of the interviews of the students which, according to Plaintiff, contradict Defendant's conclusions.  For reasons discussed below, the Court does not agree with Defendant's characterization of the notes.  But if, as Plaintiff contends, Defendant intended to deprive Plaintiff of evidence, one would have expected Defendant to have also destroyed the notes.  The fact that they were preserved provides further corroboration that Defendant had no invidious intent.

On November 2, 2022, counsel did ask Churchill to preserve video from the day of the incident, Dkt. No. 77-13, but Madigan testified that he understood the request to go only to McConkey's conduct that day and not to the conduct of the students, Dkt. No. 77-3 at 309:16–310:9.  There is no evidence that Defendant would have believed that Plaintiff thought that recordings of the students entering and leaving the bathroom were relevant to his claim or would be exculpatory.  As late as his EEOC complaint, Plaintiff's focus was on whether he merely "tapped the door open a few inches" so that his voice could be heard or instead "kicked the door in."  Dkt. No. 77-7 ¶ 30; *see also id.* ¶¶ 27, 32.  It is that action which he said that the security camera could confirm; he did not focus on the students' reactions after the fact.  Plaintiff's motion for spoliation sanctions is therefore denied.

## II.    Defendant's Motion for Leave to File an Answer

The Court next addresses Defendant's motion for leave to file an answer.  Plaintiff opposes the motion, arguing that Defendant fails to establish good cause for its late filing and that Plaintiff faces prejudice because Defendant asserts fourteen affirmative defenses in its proposed answer after discovery has closed.  Dkt. No. 116 at 1–2.  Plaintiff is not seeking a default judgment due to Defendant's failure to answer the complaint.  *Id.* at 2.

31

"'A motion to file a late answer is closely analogous to a motion to vacate a default' since 'the party seeking to answer is given the same opportunity to present mitigating circumstances that it would have had if a default had been entered and it then moved under Rule 55(c) to set it aside.'" *Neal v. 18 Susan CT LLC*, 2025 WL 1753248, at *1 (S.D.N.Y. June 25, 2025) (quoting *Graves v. Corr. Med. Serv.*, 2015 WL 1823456, at *2 (W.D.N.Y. Apr. 22, 2025), *aff'd*, 667 F. App'x 18 (2d Cir. 2016) (summary order)); *see also Integrity Comm's Corp. v. Baker*, 2011 WL 3874819, at *1 (S.D.N.Y. Aug. 5, 2011) ("The filing of a late answer is analogous to a motion to vacate default." (quoting *John v. Sotheby's, Inc.*, 141 F.R.D. 29, 35 (S.D.N.Y. 1992))); *Meehan v. Snow*, 652 F.2d 274, 275–76 (2d Cir. 1981).

Federal Rule of Civil Procedure 55(c) provides that a "court may set aside an entry of default for good cause." Fed. R. Civ. P. 55(c). The Second Circuit has "established three criteria that must be assessed in order to decide whether to relieve a party from default." *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir. 1993). "These widely accepted factors are: (1) whether the default was willful; (2) whether setting aside the default would prejudice the adversary; and (3) whether a meritorious defense is presented." *Id.* Because the Second Circuit generally disfavors defaults, the "good cause" criteria "should be construed generously," and "when doubt exists as to whether a default should be granted or vacated, the doubt should be resolved in favor of the defaulting party." *Id.*; *see also New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005) ("[A]ll doubts must be resolved in favor of the party seeking relief.").

On the first factor, Defendant argues that its failure to answer was not willful and that "the omission was inadvertent and the result of law office oversight." Dkt. No. 115 at 1. It states that the oversight occurred "in the context of ongoing and active litigation . . . including numerous discovery disputes and motion practice seeking court intervention, as well as a

32

changeover in attorneys handling the matter for Defendant due to a leave of absence." *Id.* It moved for leave and served its answer shortly following Plaintiff's opposition to summary judgment, which referenced Defendant's failure to answer the complaint. *Id.* at 1–2. "'Willfulness,' in the context of a default, refers to conduct that is *more* than merely negligent or careless." *Walden v. Lorcom Techs., Inc.*, 2007 WL 608151, at *3 (E.D.N.Y. Feb. 23, 2007); *see also Am. Alliance Ins. Co., Ltd. v. Eagle Ins. Co.*, 92 F.3d 57, 61 (2d Cir. 1996) (stating that there is "no reason to expand [the Second Circuit's] willfulness standard to include careless or negligent errors in the default context"). "Willfulness may be found when, for example, a defaulting party acts deliberately, egregiously, or in bad faith." *Haran v. Orange Bus. Servs. Inc.*, 2022 WL 2306945, at *2 (S.D.N.Y. Jun. 27, 2022). Relevant too is "the defaulting party's actions after it became aware of the existence of the litigation for entry of default." *Id.* Defendant submitted the proposed answer shortly following Plaintiff's opposition. Defendant's delay did not impede the progress of this action; Defendant had nothing to gain by not answering. Although the delay was negligent, alone it does not evince willfulness. *See Am. Alliance Ins. Co., Ltd. v. Eagle Ins. Co.*, 92 F.3d 57, 61 (2d Cir. 1996) ("Gross negligence can weigh against the party seeking relief from a default judgment, though it does not necessarily preclude relief."); *Puddu v. 6D Glob. Techs., Inc.*, 2020 WL 2833852, at *4 (S.D.N.Y. May 31. 2020) (explaining that "[w]hile it may have been careless or even grossly negligent for [defendant]—a sophisticated businessman who is no stranger to litigation"—to fail to respond to complaint, "the Court cannot conclude—in light of his explanations and resolving all doubts in his favor—that [defendant's] actions rise to the level of willfulness"); *Seaford Ave. Corp. v. ION Ins. Co.*, 2022 WL 17669438, at *3 (E.D.N.Y. Dec. 14, 2022).

33

On the second factor, prejudice, "[d]elay alone is not a sufficient basis for establishing prejudice." *Davis v. Musler*, 713 F.2d 907, 916 (2d Cir. 1983). "Rather, it must be shown that delay will result in the loss of evidence, create increased difficulties of discovery, or provide greater opportunity for fraud and collusion." *Belizaire v. RAV Investigative & Sec. Servs., Ltd.*, 310 F.R.D. 100, 106 (S.D.N.Y. 2015) (quoting *Davis*, 713 F.2d at 916); *accord Hong v. Mommy's Jamaican Market Corp.*, 2021 WL 6064101, at.*5 (S.D.N.Y. Dec. 22, 2021). There is no reason to believe that Plaintiff would be prejudiced if the Court received the late-filed answer insofar as it denies the allegations in Plaintiff's complaint. There has been ample and extended time for discovery into Plaintiff's allegations. *See* Dkt. No. 20 (setting initial six-month period for discovery); Dkt. Nos. 25, 30, 48 (granting extensions of time to complete discovery). Plaintiff would also not be prejudiced by Defendant's assertion in its answer that it terminated Plaintiff's employment for legitimate, non-discriminatory and non-retaliatory reasons. Defendant's assertion that it terminated Plaintiff's employment due to repeated unprofessional conduct is no surprise to Plaintiff: Defendant stated its reasons clearly in Plaintiff's termination letter, Plaintiff asserted in his complaint that the reasons were pretextual, Dkt. No. 1 ¶ 55, and the parties have engaged in discovery regarding the investigation of the bathroom incident and Defendant's proffered reasons for terminating Plaintiff's employment. Rebutting a professed legitimate reason for an adverse employment action as pretextual is part and parcel of a discrimination or retaliation claim under Title VII, NYSHRL, and NYCHRL. *See Weaver v. Bloomberg, L.P.*, 717 F. Supp. 3d 372, 383–84 (S.D.N.Y. 2024). Plaintiff moreover agrees that, even absent filing an answer, Defendant can offer "facts that it believes provide context or explanation" for its actions. Dkt. No. 116 at 3.

34

Plaintiff would also not be prejudiced by Defendant's failure to raise its affirmative defense that Plaintiff failed to mitigate damages. Though "[f]ailure to mitigate damages is an affirmative defense and therefore must be pleaded," *Sharkey v. J.P. Morgan Chase & Co.*, 2016 WL 7439363, at *1 (S.D.N.Y. Dec. 23, 2016) (quoting *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1580 (2d Cir. 1994))), Defendant's delay in pleading the defense will not prejudice Plaintiff. Defendant would bear the burden of proving failure to mitigate at trial; it (and not Plaintiff) would be prejudiced by any lack of discovery into the defense. *See Adore Me, Inc. v. NPC Glob. Corp.*, 2019 WL 3406545, at *13 (S.D.N.Y. July 29, 2019) (burden on defendant to prove that plaintiff's "requested damages are higher than they would be if they had been mitigated more properly.")

However, Plaintiff would be prejudiced if the Court permitted Defendant to assert its affirmative defenses under equitable doctrines of waiver, estoppel, laches, or unclean hands at this late stage after the close of discovery and two months prior to trial.[9]  *See* Dkt. No. 115-1 (proposed answer); Dkt. No. 48 (case scheduling order). Neither party has engaged in discovery regarding these affirmative defenses. Defendant is therefore not permitted to assert these proposed affirmative defenses.

---

[9] Defendant's remaining proposed affirmative defenses are not affirmative defenses but rather rebuttals of Plaintiff's claims. *Cf. Coach, Inc. v. Kmart Corps.*, 756 F. Supp. 2d 421, 432 (S.D.N.Y. 2010) ("[A] failure-to-state-a-claim defense is not vulnerable to motions to strike because the defense is analogous to a general denial and its inclusion, although likely redundant, does not prejudice plaintiffs."). Defendant states that Plaintiff cannot establish causation for his retaliation claims and that Plaintiff's termination and any resultant injuries were due to legitimate reasons, and that acts occurring outside the applicable limitations period cannot be independently actionable adverse employment actions. These defenses are "an attack on the truth of the allegations, or a rebuttal of a necessary element of the claim," and are not affirmative defenses that must be pleaded. *See Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*, 7 F.4th 50, 63 (2d Cir. 2021).

As to the last factor, Defendant has presented a meritorious defense. Though its proposed answer is a sparse and cursory denial of Plaintiff's allegations, Defendant does state that it terminated Plaintiff's employment for legitimate, non-retaliatory, and non-discriminatory reasons. If it is proven that these reasons are true and not mere pretext, this assertion "would constitute a complete defense." *See Hong*, 2021 WL 6064101, at *3 (S.D.N.Y. Dec. 22, 2021).

The three factors weigh in favor of accepting Defendant's late answer to Plaintiff's complaint, excepting the affirmative defenses noted above. Defendant's motion is therefore granted in part and denied in part.

## III.   Defendant's Motion for Summary Judgment

Defendant argues that it is entitled to summary judgment on Plaintiff's claims for sex-based discrimination because Plaintiff cannot make out a prima facie case of discrimination and, in any event, Churchill had a legitimate, non-discriminatory, and non-pretextual reason for terminating Plaintiff's employment. Dkt. No. 89 at 9–19. Defendant also argues that Plaintiff's retaliation claims fail as a matter of law because there is no causal connection between his protected activity and his termination and that Churchill had legitimate, non-retaliatory, and non-pretextual reasons for its decision. *Id.* at 19–30.

### A.   Legal Standards

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113–14 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The movant bears the burden of 'demonstrat[ing] the absence of a genuine issue of material fact.'" *Id.* at 114 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In deciding a motion for summary judgment, the

36

Court must "construe the evidence in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor." *Gilman v. Marsh & McLennan Cos., Inc.*, 826 F.3d 69, 73 (2d Cir. 2016).

A party opposing summary judgment must present evidence "in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "Therefore, only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997). "The principles governing admissibility of evidence do not change on a motion for summary judgment." *Id.* A non-movant may rely on his own testimony, including "sworn statements made in depositions or declarations under penalty of perjury," to create a genuine issue of material fact. *Knox v. CRC Mgmt. Co, LLC*, 134 F.4th 39, 49 (2d Cir. 2025). However, information that constitutes hearsay cannot create a genuine issue of material fact. "Hearsay is any out-of-court statement offered to prove the truth of the matter asserted in the statement." *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013).

In cases involving claims of discrimination or retaliation, "an extra measure of caution is merited in affirming summary judgment . . . because direct evidence of discriminatory intent is rare and such intent must often be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d. Cir. 2001)); *see Robinson v. De Niro*, 739 F. Supp. 3d 33, 73–74 (S.D.N.Y. 2023); *Wilkerson v. Metro. Transp. Auth.*, 2021 WL 5761649, at *5 (S.D.N.Y. Dec. 3, 2021). However, "the salutary purposes of summary judgment—

avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).  "[T]rial courts should not 'treat discrimination differently from other ultimate questions of fact,'" *id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)), and even in the discrimination context, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).

Defendant moves for the Court to strike or disregard the declarations of Annalisa Fratantoni ("Fratantoni"), Dkt. No. 104, Sophie Orenstein ("Orenstein"), Dkt. No. 105, Aiden Conley ("Conley"), Dkt. No. 106, Gray Parker ("Parker"), Dkt. No. 107, and Sue Fishkin ("Fishkin"), Dkt. No. 108, submitted with Plaintiff's opposition to Defendant's motion for summary judgment.  Dkt. Nos. 123, 126.  Fratantoni is a paralegal with the law firm representing Plaintiff.  Dkt. No. 104 ¶ 1.  She attests to having visited Churchill with Plaintiff's counsel on August 20, 2025, inspecting the girls' bathroom, and measuring the distance from the bathroom door to the sink, the first stall, and the second stall.  *Id.* ¶¶ 2–9.  She expresses the opinion that it is implausible that the striking of the door could have propelled a person into the sink.  *Id.* Orenstein is a 2020 graduate of Churchill who is gay and who was advised by McConkey during her junior and senior years of high school.  Dkt. Nos. 105, 113 ¶ 1, 3, 8.  She attests to her positive experiences with McConkey and her negative experiences at Churchill generally and with Wallin in particular.  *Id.*  Among other things, she attests to a conversation with Wallin in which he asked whether she "might be making . . . classmates uncomfortable," adding her opinion that the comment referred to her gender identity and sexual orientation.  *Id.* ¶ 15.  Conley is a 2017 Churchill graduate who attests that McConkey was an "amazing teacher" and "the most

inspiring teacher I had in high school or college."  Dkt. No. 106 ¶¶ 1, 3, 5.  Parker was an Assistant Art Teacher at Churchill from 1996 to 1999, who had a great relationship with McConkey, remained good friends with him, and never saw him have anger management issues. Dkt. No. 107 ¶¶ 1, 4, 10.  Fishkin is the mother of a child who graduated from Churchill in 2004 and who took art classes with McConkey before ultimately becoming an artist.  Dkt. No. 108 ¶¶ 1–2.  She never saw McConkey have anger management issues but did hear McConkey sometimes say that Wallin made references to McConkey being gay and said hurtful things.  *Id.* ¶¶ 8–9.

Federal Rule of Civil Procedure 56(c) provides that on summary judgment "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c).  "[M]otions to strike are not required by Federal Rule of Civil Procedure 56, nor by this Court's Local Civil Rule 56.1, and are superfluous in summary judgment practice."  *de Abreu v. Bank of Am. Corp.*, 812 F. Supp. 2d 316, 319 (S.D.N.Y. 2011); *see also Ferraresso v. Town of Granby*, 646 F. Supp. 2d 296, 301 (D. Conn. 2009) ("The Federal Rules of Civil Procedure do not explicitly allow motions to strike in the context of summary judgment.").  To the extent Defendant challenges the declarations as containing inadmissible statements, the Court treats Defendant's motion as an objection under Rule 56(c).  To the extent Defendant moves to strike the declarations, the motion is denied. Although Rule 12(f) motions to strike are directed only to the pleadings, *see* Fed. R. Civ. P. 12(f), the court has inherent power "to strike materials outside the pleadings that are 'abusive or otherwise improper.'"  *Lively v. Wayfarer Studios LLC*, 2025 WL 1410702, at *1 (S.D.N.Y. May 15, 2025) (quoting *Outlaw v. City of New York*, 2024 WL 4825955, at *3 (S.D.N.Y. Nov. 19, 2024)).  But such supervisory power is exercised when documents are "used to gratify private

39

spite or promote public scandal or serve as reservoirs of libelous statements for press consumption." *Brown v. Maxwell*, 929 F.3d 41, 51 (2d Cir. 2019) (internal citations and quotations omitted). Defendant has not met that standard here.

The declarations contain inadmissible statements or otherwise fail to create a genuine issue of material fact. Fratantoni is a paralegal and there is no showing that she is competent to render an opinion with respect to the force that would be necessary to propel a student who was behind the bathroom door to the sink. That testimony is inadmissible. *See Du v. Party Perfect Rentals LLC*, 731 F. Supp. 3d 392, 399 (E.D.N.Y. Apr. 15, 2024) (noting it is "well settled" that biomedical experts may testify, as experts, "as to . . . whether the force sustained by a plaintiff in the subject accident could potentially cause certain injuries," but may not testify as to the specific cause of an injury absent medical training.); *cf. In re Bridge Const. Servs. of Fla.*, 39 F. Supp. 3d 373, 383 (S.D.N.Y. 2014) (lay witness could testify about personal experience of the impact of a collision). The testimony also is immaterial. Defendant does not contend on summary judgment that the student hit the sink as opposed to just went "flying," and the testimony therefore does not go to an issue that is disputed on this motion. Fishkin's statement that McConkey told her that Wallin made homophobic statements to McConkey is hearsay and inadmissible for the truth of the matter asserted, *i.e.*, that Wallin made homophobic statements to McConkey. Fed. R. Evid. 801(c); *see Gilligan v. Town of Moreau*, 234 F.3d 1261, 2000 WL 1608907, at *3 n.4 (2d Cir. 2000) (summary order) ("The testimony of witnesses as to what someone else told them a party said is inadmissible double hearsay."). It would potentially be admissible as a prior consistent statement (and therefore could be considered for its truth) if Plaintiff's statements were challenged at trial, but it cannot substitute for testimony from Plaintiff himself that Wallin made statements regarding McConkey's sexual orientation. The statements of Orenstein, Conley, and

Parker regarding McConkey's qualities as a teacher, mentor, and artist are admissible, but they are immaterial on this motion. The Court is prepared to assume the truth of each of their statements, but none goes to a material issue on this motion.

### B.    Plaintiff's Claims of Sex-Based Discrimination

#### 1.    Discrimination Under Title VII

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discrimination against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. 2000e-2(a)(1). "[D]iscrimination based on homosexuality or transgender status necessarily entails discrimination based on sex." *Bostock v. Clayton County*, 590 U.S. 644, 669 (2020). Thus, "[a]n employer who fires an individual merely for being gay or transgender defies the law." *Id.* at 683.

Where there is no direct evidence of discrimination, claims of adverse employment discrimination under Title VII are governed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g., Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014). Under this standard, Plaintiff must first show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. *See Ruiz v. County of Rockland*, 609 F.3d 486, 491–92 (2d Cir. 2010). "Once a plaintiff meets this initial burden, the burden then shifts to the defendant to offer a legitimate nondiscriminatory reason for this termination. If defendant does so, the burden returns to the plaintiff to show that the real reason for [the adverse action] was his [protected status]." *Id.* at 492; *see Nambiar v. Cent. Orthopedic Grp., LLP*, 158 F.4th 349, 365 (2d Cir. 2025) (once defendant has established "a legitimate, non-discriminatory

41

basis" for the adverse employment action, the plaintiff "must 'produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action'" (citation modified) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000))). "While this framework allows the evidentiary burden to shift between the parties, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Nambiar*, 158 F.4th at 363 (quoting *Reeves*, 530 U.S. at 143).

In his opposition to the motion for summary judgment, Plaintiff relies on a single alleged adverse action—the decision to terminate his employment in October 2022. Dkt. No. 101 at 14–15. Defendant argues that Plaintiff has not established a prima facie case or set out evidence giving rise to an inference of discrimination because the decision to terminate McConkey's employment was made by Madigan, who did not make any discriminatory comments or show any discriminatory animus towards Plaintiff, and it was made only after an investigation substantiated the complaints made by the students. Dkt. No. 89 at 10–11. Defendant also argues that it has demonstrated a legitimate, non-discriminatory basis for its decision to terminate Plaintiff's employment. *Id.* at 12–14.

At the summary judgment "stage of the litigation, . . . there is little to be gained in assessing whether [Plaintiff] can make out a *prima facie* case, as opposed to focusing on the third step of the *McDonnell Douglas* analysis." *Weaver v. Bloomberg L.P.*, 717 F. Supp. 3d 372, 384 (S.D.N.Y. 2024). "[J]udicial inquiry into the *prima facie* case is usually misplaced" on motions for summary judgment. *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) (Kavanaugh, J.); *see also Howard v. MTA Metro N. Commuter R.R.*, 866 F. Supp. 2d 196, 205

42

(S.D.N.Y. 2011) (collecting cases). The Court thus proceeds to steps two and three of the *McDonnell Douglas* analysis. Assuming that Plaintiff has made out a *prima facie* case of discrimination, the Court assesses whether Plaintiff has raised a genuine issue of material fact as to whether Defendant's decision to terminate Plaintiff for unprofessional conduct was pretextual.

Defendant has identified a legitimate, non-discriminatory basis for the termination of Plaintiff's employment. "An employer has an obvious and legitimate interest in addressing employee misconduct." *Bamba v. U.S. Dep't of Homeland Sec.*, 2024 WL 3924810, at *24 (S.D.N.Y. Aug. 23, 2024) (citing cases). Plaintiff's employment agreement with Churchill provided that his employment was governed by Churchill's Employment Practices as outlined in the Employee Handbook. SUF ¶¶ 19–20; CSUF ¶¶ 19–20. The Employee Handbook, which was signed by Plaintiff, provided that employees would be subject to discipline, including termination of employment, for violating the conditions of the Handbook. SUF ¶ 22; CSUF ¶ 22. The Employee Handbook also contains Standards of Conduct and a Code of Conduct that provides that all employees are required at all times to act as ambassadors of the school and to exhibit high standards of moral, ethical, and lawful behavior and to refrain from conduct that disrupts the orderly conduct of class or school activities, intimidates or harasses any person, or otherwise undermines a safe, orderly, and respectful school environment. SUF ¶¶ 26–28; CSUF ¶¶ 26–28. The Professional Conduct Policy of the school requires school professionals to conduct themselves in a professional and courteous manner with students, parents, and colleagues. SUF ¶ 31; CSUF ¶ 31.

After an investigation, Defendant concluded that Plaintiff had engaged in unprofessional behavior towards both students and colleagues and had failed to modify that behavior after numerous warnings. The investigation concluded that Plaintiff had "angrily confronted two

43

students who had left [Plaintiff's] classroom without permission by kicking the girls' restroom door open with such force it knocked a student into the sink" and that he then failed to acknowledge or even admit to his conduct and exhibited a "defensive attitude" when he returned to the classroom. Dkt. No. 102-8. That conduct occurred against a backdrop of a suspension that Plaintiff had been given in December 2017 for "unprofessional outbursts of anger and intimidation of students" and counseling Plaintiff had been given in June 2021 about "unprofessional behavior and inappropriate conversations with staff and students." Dkt. No. 86-31. Defendant's investigation provided a legitimate, non-discriminatory reason for termination of Plaintiff's employment.

As Defendant has raised a legitimate, non-discriminatory reason for Plaintiff's termination, the burden shifts back to Plaintiff to demonstrate a genuine issue of material fact as to whether Defendant's reason is pretextual. *Nambiar*, 158 F.4th at 365. A plaintiff may succeed in demonstrating "that the proffered reason was not the true reason for the employment decision" "either directly by . . . [showing] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253–54 (1981); *accord Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 309 (2025). "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148. To survive summary judgment, a plaintiff's prima facie case and evidence of pretext together must provide "not simply 'some' evidence, but sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment

44

action." *Nambiar*, 158 F.4th at 365 (quoting *Weinstock*, 224 F.3d at 42).  Plaintiff has produced insufficient evidence to raise a genuine dispute of material fact that the reasons offered by Defendant for its termination of Plaintiff were false or that, as to the ultimate issue, it is more likely than not that discrimination was the real reason for the employment action.

Plaintiff levels a scattershot attack at Defendant's evidence of a legitimate, non-discriminatory reason for his termination.  Plaintiff argues that inconsistencies in the investigation into the bathroom incident create a genuine issue as to whether Defendant's decision to fire Plaintiff for unprofessional conduct was pretextual.  He notes that the termination letter stated that Plaintiff kicked the bathroom door "with such force it knocked a student into the sink," but no student or staff member reported that a student was knocked into a sink, and the evidence at best shows that a student was knocked into a stall.  Dkt. No. 110 at 21.  Plaintiff also argues that the video evidence supports his characterization that the action that resulted in the opening of the door was a push by the foot rather than a kick by the leg.  *Id.* at 22–26.  For the conclusion that Defendant was motivated by discriminatory animus, Plaintiff relies on Wallin's repeated reference to the 2001 whiteboard incident, his comments to Plaintiff that Plaintiff would like a newly hired teacher when that teacher was gay, and his comment that he would not support appointing "someone like you" as chair.  *Id.* at 15–16.  Plaintiff finally offers Wallin as a relevant comparator who displayed anger in the workplace but was not similarly disciplined.  *Id.* at 19.  Though Plaintiff marshals varied pieces of evidence, he fails to raise a genuine issue that discrimination played a part in the decision to fire him.

Plaintiff has not demonstrated that Churchill's investigation of the bathroom incident was the kind of "clearly irregular investigative or adjudicative process" that raises an inference of pretextual decision-making.  *Menaker v. Hofstra Univ.*, 935 F.3d 20, 34 (2d Cir. 2019).  The

conclusions were reached only after an impartial investigator, Bruna, had interviewed the three students at issue and five Churchill employees over the course of six days, and after Madigan, Bruna, and Wallin had viewed video clips of the incident in question and gave McConkey an opportunity to be heard.  SUF ¶¶ 125, 128, 138.  Bruna took detailed notes of the interviews.  *See* Dkt. No. 90-29.  The students, whose complaint initiated the investigation, SUF ¶ 117, CSUF ¶ 117, all corroborated that Plaintiff opened the door with force, *see* SUF ¶¶ 111, 129–131; CSUF ¶¶ 111, 129–131, and those that saw the door open corroborated that Plaintiff hit a student with the door, SUF ¶¶ 129, 131.  Iglesias also reported to investigators that Plaintiff told her he "just kicked" the door.  SUF ¶ 134; CSUF ¶ 134.  The investigators viewed the surveillance footage of the incident.  The surveillance footage depicts Plaintiff's motion and is consistent with the conclusion that he kicked the door.  *See* Dkt. No. 77-16.  Whether the action is characterized as a kick by the leg or a touch by the foot is ultimately irrelevant.  Plaintiff has introduced no evidence to undermine Defendant's conclusion that, whether characterized as a kick or a tap, the action of Plaintiff's leg was sufficiently forceful to open the door and to hit a student on the other side.  Plaintiff himself admitted in his interview that when he forced open the door, a student said, "OMG [Student A] just flew across the floor."  Dkt. No. 90-29 at 6.  And Plaintiff himself was reported as admitting that the action he took was a "kick."  *Id.* at 9 (Student A stating that Plaintiff told her, "Yeah, I just kicked the door"); *id.* at 5 (Iglesias stating that Plaintiff said "I just kicked in the door to see what was going on").

Churchill's investigation was not one where "the evidence substantially favor[ed] one party's version of a disputed matter, but an evaluator form[ed] a conclusion in favor of the other side (without an apparent reason based in the evidence)," or "where decision-makers cho[se] 'to accept an unsupported accusatory version over [that of the accused], and declined even to

explore the testimony of [the accused's] witnesses." *Menaker*, 935 F.3d at 34 (quoting *Doe v. Columbia*, 831 F.3d 46, 57 (2d Cir. 2016)).  The investigators' conclusions that Plaintiff kicked the door and in doing so hit a student is supported by the evidence, and Plaintiff has identified no obvious sources of evidence favoring him that the investigators ignored in reaching that conclusion.  The Court need not find that the investigators reached the correct conclusion to determine that Defendant's reasons for terminating Plaintiff were legitimate and non-pretextual. "[T]he issue to be proven in a discrimination case is whether there was an improper motive for the employment decision—not whether any conduct relied upon by the employer actually occurred." *Bamba*, 2024 WL 3924810, at *25 (quoting *Oluyomi v. Napolitano*, 811 F. Supp. 2d 926, 947 (S.D.N.Y. 2011), *aff'd*, 481 F. App'x 693 (2d Cir. 2012) (summary order))).  The Court does "not sit as a super-personnel department that reexamines an entity's business decisions." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014) (quoting *Scaria v. Rubin*, 117 F.3d 652, 655 (2d Cir. 1997)).  There is no evidence that the administrators had reason to disbelieve the students who made the complaint against Plaintiff.  *Cf. Menaker*, 935 F.3d at 34 (noting that an investigation suffered from irregularities where, *inter alia*, investigators knew the falsity of one of the allegations and were aware that an accusing student had previously attempted to manipulate the department).

Plaintiff challenges the investigation as pretextual in part due to purported discrepancies among the investigation's witnesses.  "To show pretext [in a discrimination claim], a plaintiff can point to weaknesses, implausibilities, inconsistencies, or contradictions in an employer's offered reason for its adverse action," evidence that "the employee believed the conduct was permissible[,] and any procedural irregularities" in the termination decision.  *King v. Aramark Servs. Inc.*, 96 F.4th 546, 565 (2d Cir. 2024) (internal quotation marks and citation omitted).

47

Plaintiff argues that there are such inconsistencies in Student A's statements.  Dkt. No. 110 at 22. Two of the teachers that Bruna interviewed said that Student A told them that McConkey kicked the door open, the door hit her back and sent her flying, and she "stop[ped] on the stall."  Dkt. No. 90-29 at 2.  Another teacher told Bruna that Student A reported that Plaintiff kicked the door, that the door hit Student A, and that Student A flew backwards as a result of the kick.  *Id.* During Bruna and Wallin's interview with Student A, she said that she was "jolted and went flying from the door."  *Id.* at 4.  The Incident Report stated that Student A said she was "struck by the door, 'jolted', and sent into a forward motion, using the closed bathroom stall to break her fall."  *Id.* at 17.  Meanwhile, another student who saw Plaintiff kick the door did not "say anything" about whether Student A moved from the force, and another student who was in the stall and did not witness the door opening did "not say she heard [Student A] hit one of the stalls," but reported hearing the door slam open.  Dkt. No. 110 at 22.  The purported discrepancies are immaterial.  Whether Student A was kicked into the wall of a stall or simply went flying was not material to the school's conclusion.  The point of the report was that Defendant acted angrily in response to the students' absence and in so doing hit a student with the back of the bathroom door.  What is remarkable about the interview notes is not their differences; the reports of two persons who view an event from different vantages will often contain discrepancies, as will the statements of a single individual who is asked to report the same event twice.  *See Vargas v. APL Ltd.*, 431 F. Supp. 3d 82, 87 n. 8 (E.D.N.Y. 2019) (inconsistencies regarding the color of uniform and ladder at issue in plaintiff's claims did not render witness's testimony incredible as a matter of law); *Butler v. Gonzalez*, 2010 WL 3398150, at *10 (S.D.N.Y. Aug. 26, 2010) ("minor inconsistency" between plaintiff's "pleadings and his deposition testimony" regarding his actions just prior to the assault "does not render [his]

48

testimony incredible"). What is notable is their consistencies. All of the evidence demonstrates that Plaintiff's conduct resulted in Student A being hit by the door sufficiently forcefully that she "went flying."

The Second Circuit has held that differences among witnesses or between recited facts and the stated reason for an adverse action do not give rise to an inference of pretext when they are "variations . . . on the same theme rather than inconsistent justifications." *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 170 (2d Cir. 2001); *see Goldzweig v. Consol. Edison Co. of N.Y.*, 2026 WL 21005, at *2 (2d Cir. Jan. 5, 2026); *Singh v. Air India Ltd.*, 108 F. App'x 9, 10 (2d Cir. 2004) (summary order) (different but consistent explanations for termination did not demonstrate pretext). The witnesses that the Churchill investigators interviewed, both students and staff, all generally reported that Plaintiff left his classroom to find missing students in the bathroom, kicked open the bathroom door and in doing so hit a student, and was generally unapologetic upon returning to the classroom. Defendant terminated Plaintiff due to his "unprofessional behavior towards both students and colleagues and [his] failure to modify that behavior after numerous warnings." Dkt. No. 97-15. That Defendant wrote in the termination letter that the door "knocked a student into the sink" without evidentiary support, while citing other corroborated aspects of the incident, *id.*, does not create a genuine issue of whether Defendant's decision to terminate Plaintiff for unprofessional behavior was mere pretext. The Second Circuit has emphasized that challenging an investigation as pretextual "requires *clear* irregularities to raise an inference of bias," and "minimal irregularities (absent other indicia of bias) do not suffice to suggest discrimination." *Menaker*, 935 F.2d at 34 n.50.

Plaintiff's broad attack that a jury could find Wallin, Bruna, and Madigan to be incredible witnesses, Dkt. No. 110 at 25, does not create a genuine issue of fact. "A plaintiff cannot carry

her burden at trial simply by calling into question the credibility of witnesses who have testified against her." *Lively*, 2026 WL 905447, at *63 (S.D.N.Y. Apr. 2, 2026) (citing *Dyer v. MacDougall*, 201 F.2d 265, 269 (2d Cir. 1952)); *see Kidd v. Midland Credit Mgmt., Inc.*, 2019 WL 4736913, at *2 (E.D.N.Y. Sept. 27, 2019) ("Courts routinely reject attempts by parties to raise an issue of fact on summary judgment solely by challenging the opposing party's testimony on credibility grounds."). Plaintiff can point to no evidence that contradicts Wallin, Bruna, and Madigan's testimony that they terminated Plaintiff's employment due to his unprofessional conduct and outbursts of anger. *See* Dkt. No. 90-2 at 236:15–22; Dkt. No. 90-3 at 250:8–25; Dkt. No. 90-4 at 257:8–259:8.

In the absence of evidence that the investigation was pretextual, Plaintiff ultimately relies on various remarks by Wallin to argue that he was animated by discriminatory intent. The evidence does not create a genuine issue of material fact.

In considering whether an employee's remarks "are probative of discriminatory intent," the court considers "a number of factors, including: '(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).'" *Nambiar*, 158 F.4th at 365–66 (quoting *Henry v. Wyeth Pharms.*, 616 F.3d 134, 149 (2d Cir. 2010)). "It is well established that 'stray remarks alone do not support a discrimination suit.'" *Id.* (quoting *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998)).

Although Wallin was a supervisor, he was not the ultimate decisionmaker in Plaintiff's termination, and the comments to which Plaintiff points were remote from the decisionmaking

50

process.  It is undisputed that Madigan made the decision to terminate Plaintiff's employment.  SUF ¶ 141; CSUF ¶ 141.  Wallin was consulted as part of the decisionmaking process, but the evidence is uncontradicted that he initially resisted a decision to terminate Plaintiff's employment.  Dkt. No. 90-3 at 251:21–252:11.  None of the alleged comments was made proximately to the termination decision.  *Cf. Tolbert v. Smith*, 790 F.3d 427, 438 (2d Cir. 2015) (finding an issue of fact as to discriminatory motive where "remarks clearly suggest[ing] racial bias" were made within the same school year that plaintiff was denied tenure).  And, to the extent that any of the comments made by Wallin could give rise to an inference of discrimination, such inference is too weak to create a genuine issue of material fact.

The primary evidence to which Plaintiff points is the testimony that during his formal review meetings, Wallin reminded McConkey of the incident where an anti-gay slur was written by an unknown person on the whiteboard in Wallin's classroom and stated that Plaintiff intimidated him during the incident.  SUF ¶ 44; CSUF ¶¶ 44, 299; RSUF ¶ 299.  Wallin did not write the slur, SUF ¶ 40; CSUF ¶¶ 40, and there is no evidence that in any meeting Wallin referenced the slur directly or repeated it, CSUF ¶ 299; RSUF ¶ 299.  Rather, the evidence is consistent that Wallin referenced Plaintiff's encounter with him (and the reasons for the encounter only to identify it) as an illustration of conduct that Wallin believed to be hostile and inappropriate.  *See* Dkt. No. 97-1 at 229:13–22 (Plaintiff testifying that Wallin would raise the incident by stating "remember that time with the whiteboard . . . And how intimidating you were?").  Plaintiff affirmed as much in his complaint to Bruna about Wallin's conduct, where he described that in performance reviews, Wallin "brings up how afraid he was of me during that situation from over twenty years ago." Dkt. No. 90-33.[10]  While the reference may have

---

[10] Indeed, the evidence is undisputed that Plaintiff himself initiated discussion of the incident in

reminded Plaintiff of the slur, and while it may have been ill-advised of Wallin to use it as an example, there is no evidence that Plaintiff complained prior to his email to Bruna and Wallin persisted in referencing the incident or that the comment reflected that Wallin had an animus against Plaintiff because of Plaintiff's sexual orientation.  By Plaintiff's own account, Wallin directed himself to Plaintiff's reaction to a fellow teacher and not to Plaintiff's protected characteristic.  When viewed in their entirety, Wallin's reviews of Plaintiff do not support an inference of discriminatory intent based on sexual orientation.  Wallin consistently praised Plaintiff for his ability to provide a welcoming and safe space to LGBTQ+ students, comments inconsistent with discriminatory animus.  *See, e.g.*, Dkt. No. 97-11 (March 2021 performance review praising Plaintiff's participation in Prism, the LGBTQ+ affinity group, and for creating a safe place for students and staff); Dkt. No. 97-17 (Spring 2020 performance review praising Plaintiff's work with LGBTQ students and his "willingness to encourage students to open up and his ability to help them process").  There also is no evidence that Wallin made the alleged comment any time close to Plaintiff's termination, or even at Plaintiff's most recent review prior to the termination.  Although Plaintiff stated that the incident was raised at every review, when asked more directly, he admitted that he did not remember whether Wallin brought up the incident at his 2022 review, and he stated that the review did not trigger his decision to send the June 14, 2022 email.  Dkt. No. 97-1 at 246:2–11.

---

his October 2017 conversation with Wallin, where he raised it as relevant, not to his identity, but as to issues regarding his temper and interactions with staff.  Dkt. No. 86-26 at 29:14–25 (Plaintiff stating "I don't know that I'm so explosive . . . I think that, you know, if you went back 20 years, you could bring up all sorts of things. . . .  I mean, there's an interaction we had your first year here, 16 years ago.  I don't even remember what it was, but you remember . . .  And that makes sense").

Next, Plaintiff also relies on a statement in his EEOC affidavit that "whenever Churchill hired a gay teacher, Wallin would tell me that I was going to like the person, which he did not do when the School hired heterosexual teachers." Dkt. No. 102-2 ¶ 18; *see* SUF ¶ 171; CSUF ¶ 171. But Wallin was only appointed co-principal in 2015, and Plaintiff does not allege how many gay or heterosexual teachers were hired between 2015 and 2022, how often teachers were hired, or when the alleged comments were made. There is no evidence of any comment being made proximately to the termination decision. Even were they proximate to Plaintiff's termination, Wallin's comments do not create an inference of discriminatory intent. It would not be atypical for a principal to praise a new addition to the faculty in a comment to a long-time teacher. The fact that Wallin may have said nice things about a new teacher who happened to be homosexual does not indicate that he said the nice things because the teacher was homosexual or because the person to whom he was addressing himself was also homosexual. *See Stinson v. City Univ. of N.Y.*, 2018 WL 2727886, at *10 (S.D.N.Y. June 6, 2018) (comment that plaintiff and new supervisor, who were both African-American, would be a "good fit" was insufficient "to build a plausible claim for discriminatory intent."). Indeed, the fact that Churchill was hiring teachers who were homosexual as well as those who were heterosexual, and that Wallin spoke highly about the homosexual teachers, hardly speaks to discriminatory intent. "[A] plaintiff's subjective belief that a comment is discriminatory in nature does not, standing alone, support an inference of discrimination." *Kim v. Regeneron Pharm., Inc.*, 2026 WL 820603, at *9 (S.D.N.Y. Mar. 25, 2026); *accord Desir v. Bd. of Co-op. Ed. Servs.*, 803 F. Supp. 2d 168, 179 (E.D.N.Y. 2011), *aff'd*, 469 F. App'x 66 (2d Cir. 2012) (summary order).

Plaintiff also points to Wallin's statement in an October 16, 2017 meeting with Madigan, where Plaintiff talked to Madigan about becoming head of the art department, and Wallin asked

53

how he could "support a person like [McConkey]."  SUF ¶¶ 158, 160; CSUF ¶¶ 158, 160. Plaintiff and Wallin discussed the October 16 meeting and Wallin's comment specifically in a meeting on October 24, 2017.  SUF ¶ 159, CSUF ¶ 159.  Plaintiff asked Wallin what he meant by "a person like you," and Wallin said, "To me, 'a person like you' is a person who loses his temper."  Dkt. No. 90-26 at 17.  There is no evidence that the comment referred to Plaintiff's sexual orientation.

Absent any evidence of a discriminatory comment made by Wallin to Plaintiff, Plaintiff points to evidence which he contends shows Wallin's anti-gay bias towards others at Churchill. "An inference of discrimination can arise from discriminatory behavior on the part of the employer towards other members of a plaintiff's protected class."  *See Desrosiers v. Summit Sec. Servs.*, 2022 WL 13808524, at *6 (S.D.N.Y. Oct. 21, 2022); *accord Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015).  But the evidence, even construed favorably, does not give rise to an inference of discriminatory animus.  Greene, Churchill's Director of DEI, testified that Wallin was "unaware of appropriate ways to say things," would sometimes use out-of-date and "problematic" terminology even after being told not to, and was not well-versed in LGBTQ+ issues.  CSUF ¶¶ 314–15, 317; RSUF ¶¶ 314–15, 317.  She did not offer any other specifics in terms of the content of things Wallin said, when he said them, or who he said them about.  The fact that a person is not "well-versed" in LGBTQ+ issues does not demonstrate that the person is hostile to a person because they identify as being other than a binary heterosexual.[11]  Such "vague and conclusory allegations without more do not raise a factual dispute as to pretext."  *See*

---

[11] The only specific statement Greene attributes to Wallin is his use of the phrase "you guys" when referring to staff, which she told him was misgendering.  Dkt. No. 90-5 at 67:8–10. Greene does not identify when she discussed this phrase with Wallin.  In any event, Wallin's use of the phrase "you guys" does not create a triable issue as to discriminatory intent.

*Edwards v. Noem*, 2026 WL 861558, at *8 (S.D.N.Y. Mar. 30, 2026) (allegation that "actual verbiage towards women was inappropriate" and that "[t]he tone, the physical interactions are all different between males and females" was too vague and conclusory to survive summary judgment); *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008) ("a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment" on a discrimination claim).

In addition, Orenstein, who graduated from Churchill in 2020, described Wallin as being unsupportive, failing to prevent her from being bullied, and adding to her distress by suggesting that she might be making the students who taunted her uncomfortable, which she interpreted as a reference to her gender identity and sexual orientation. Dkt. No. 113 ¶¶ 10, 12, 15. Evidence that a witness perceived that a statement reflected a discriminatory animus does not support that the witness made a discriminatory statement. *Desir*, 803 F. Supp. 2d at 179. Moreover, Orenstein does not state when Wallin was unsupportive. It would have had to be prior to her graduation in 2020. This evidence is too vague and too attenuated from Plaintiff's termination to create a genuine issue of discriminatory motive. *See Maqsood v. Bell Sec., Inc.*, 249 F. App'x 229, 230 (2d Cir. 2007) (summary order) (comments made two years prior to termination were "'remote' from any adverse employment action"); *Testa v. CareFusion*, 305 F. Supp. 3d 423, 434 (E.D.N.Y. Apr. 3, 2018) ("stray remarks made [five] months before plaintiff's termination are insufficient to demonstrate a discriminatory intent").

In addition to Wallin, Plaintiff also attempts to create a genuine issue of material fact by suggesting that Madigan and Bruna were motivated by discriminatory bias. Those efforts are similarly unavailing. Plaintiff offers that neither Bruna nor Madigan reported McConkey's June 2022 email to Churchill's HR representative and that both failed to formally investigate the

discrimination and harassment concerns McConkey raised in that email.  CSUF ¶¶ 357, 360–61; RSUF ¶¶ 357, 360–61.[12]  Plaintiff argues that the case is thus analogous to *Knox*, in which the Second Circuit held that a plaintiff satisfied her prima facie burden to show that the termination of her employment took place under circumstances evincing discriminatory intent by proffering evidence that she was the victim of racially derogatory slurs by one supervisor and that when she presented such evidence to a second supervisor, he failed to investigate.  134 F.4th at 48.  "The failure of an employer to conduct an adequate investigation or to undertake an appropriate response can constitute evidence in support of a Title VII plaintiff's allegations."  *Sassaman v. Gamache*, 566 F.3d 307, 314–15 (2d Cir. 2009).[13]  However, the failure to investigate alone is insufficient to forestall summary judgment.  *Id.*; *see Forrester v. Prison Health Servs.*, 2015 WL 1469521, at *17 (E.D.N.Y. Jan. 5, 2015) (allegation that defendant conducted an inadequate investigation of a discrimination complaint "alone is insufficient to demonstrate discriminatory intent . . . [g]iven the well-documented complaints about plaintiff's performance"), *report and*

---

[12] Defendant's response to Plaintiff's complaint is disputed.  Bruna states that she asked Plaintiff to discuss the complaint, and he told her there was nothing more to be done.  SUF ¶ 183. Plaintiff asserts that he did not decline to discuss the complaint and states that he tried to follow up with Bruna regarding the complaint, but each time he attempted to speak with her, she was unavailable.  CSUF ¶ 183.  Construing the facts in Plaintiff's favor, the evidence shows that neither Bruna nor Madigan instigated a formal investigation into Plaintiff's complaint.

[13] In *Sassaman*, the Circuit addressed a circumstance where the defendant failed to investigate a complaint of harassment lodged *against* the plaintiff and instead concluded that since plaintiff was a man, the complaint warranted termination.  566 F.3d at 314–15.  The Circuit concluded that the failure to adequately investigate the complaint and the use of it to justify an adverse employment action created an inference of discriminatory intent.  *Id.*  The defendant assumed that because the plaintiff was a man, the complaint must have been justified, without doing any work to confirm that conclusion.  However, the court's language reached more broadly.  The court stated that "Title VII suits often require a court or jury to consider whether an employer's response to an allegation of discrimination *itself* constitutes evidence of discrimination or liability for discrimination.  When employees complain of Title VII violations, for example, employers can be held liable . . . if they do not fulfill their duty to take reasonable steps to remedy the violation."  *Id.* at 314 (cleaned up).

*recommendation adopted as modified*, 2015 WL 1469737 (E.D.N.Y. Mar. 30, 2015), *aff'd*, 651 F. App'x 27 (2d Cir. 2016) (summary order); *see also Baby v. Nassau Healthcare Corp.*, 2017 WL 3278901, at *6 (E.D.N.Y. Aug. 1, 2017) ("Numerous courts have concluded that a supervisor's failure to respond adequately to a plaintiff's complaint about derogatory comments made by a co-worker is insufficient to show that the supervisor himself harbored discriminatory intent." (collecting cases)).  The Court in *Knox* did not hold that the failure to investigate could overcome defendant's proffer of a legitimate non-discriminatory reason for an adverse employment action.  It held only that the failure to investigate combined with the racially derogatory slur satisfied the plaintiff's relatively relaxed burden at stage one of the McDonnell-Douglas test to show facts evincing an inference of discriminatory intent.  Plaintiff's burden at stage three is significantly more demanding.  The plaintiff must present more than evidence sufficient to establish a prima facie case.  He must proffer evidence sufficient for a jury to find that the employer's "justification was pretextual or that her firing 'was motivated at least in party by [her] membership in a protected class.'" *Knox*, 134 F.4th at 48 (quoting *Bart v. Golub Corp.*, 96 F.4th 566, 576 (2d Cir. 2024)).  Evidence of a failure to investigate does not satisfy that burden.  Plaintiff's allegations that Madigan and Bruna failed to adequately investigate his prior complaint cannot alone support a finding that the reasons Churchill gave for Plaintiff's termination were pretextual and that Defendant was motivated, at least in part, by discriminatory intent.

Plaintiff's remaining allegations regarding Madigan rely on broad allegations that Madigan fell short in promoting an inclusive environment at Churchill.  Plaintiff relies primarily on the testimony of Greene.  Dkt. No. 90-6 at 114:12.  Greene testified that there was a teacher who left the school "because they were not comfortable at [Churchill]" and "had a horrible,

57

horrible experience," and that she "believe[s] it was solely around because of how they identified." Dkt. No. 90-5 at 96:9–11, 19–20. She testified that students reacted negatively to the teacher's teaching style and "their identity just got amplified because they were bringing in a different teaching[] style plus they looked how they looked . . . [and] they wanted the students to call them the name they wanted. They wanted the students to use their proper pronouns . . .[and] that [] didn't always happen." *Id.* 99:3–14. She testified that she told Madigan that "[Wallin] needed specific training around things because as their direct supervisor, if you're unable to support your subordinate, then you are not doing your job . . . [and Wallin] is not equipped to support the experience that that individual is having." *Id.* at 97:6–13. She testified that Wallin "needed some specific training" and that she "recommended things for him to do" and that she told Madigan "that as a leadership team, we needed to be more committed to the work and show that commitment to our school professionals in a more blunt way." *Id.* 97:14–16, 98:2–6.[14] Greene did not identify when the teacher left, when the conduct occurred, or when she spoke to Madigan. Greene also did not testify that Wallin and Madigan were indifferent to the teacher's negative experience or made any negative remarks in regard to the teacher. In sum, construed favorably to Plaintiff, Greene testified that she reported to Madigan that the school did not do enough to support a teacher who felt harassed because students failed to use the teacher's name and proper pronouns.

In the context of a hostile work environment claim, an employer can be "directly liable for [a coworker's] unlawful harassment if the employer was negligent with respect to the offensive behavior." *Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013). "When harassment is

---

[14] Greene did not testify to any percipient, non-hearsay, knowledge of Wallin's conduct with respect to the teacher.

perpetrated by the plaintiff's co workers, an employer will be liable if the plaintiff demonstrates that 'the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.'" *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 (2d Cir. 2011) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)).  However, even assuming students are properly analogized to coworkers, this principle would not extend to Plaintiff's claim here: an adverse employment action claim which requires that Plaintiff demonstrate that the comments have "a causal nexus to the termination decision." *Luka v. Bard Coll.*, 263 F. Supp. 3d 478, 487 (S.D.N.Y. 2017); *see also Levy v. N.Y.C. Health & Hosp.*, 660 F. Supp. 3d 220, 232 (S.D.N.Y. 2023) ("Numerous courts have held that discriminatory comments in the work environment by individuals without the authority to make employment decisions are insufficient to raise an inference of discriminatory intent." (collecting cases)); *Berry v. Empire Homes Servs. LLC*, 2010 WL 1037948, at *8 (E.D.N.Y. Mar. 18, 2010) (rejecting argument that supervisors "tacitly approved of" coworker's discriminatory comment, and holding that the "alleged failure to discipline [the coworker] does not create an inference of intentional discrimination"); *Anderson v. Hertz Corp.*, 507 F. Supp. 2d 320, 328 (S.D.N.Y. 2007) (finding it would not "be appropriate to infer that [a supervisor] acted with discriminatory animus for failing to discipline employees whom Plaintiff himself refused to discipline").  The failure of Madigan and Wallin to do all they could to make the teacher comfortable does not demonstrate that they endorsed the students' alleged conduct or that they had a discriminatory animus, much less one that infected Plaintiff's employment decision.  *See Buckman v. Calyon Sec. (USA) Inc.*, 817 F. Supp. 2d 322, 336 (S.D.N.Y. 2011) (where discriminatory remark was made five months

59

prior to termination decision and by a supervisor who did not make the termination decision, it was "too remote in time and context" to support an inference of discrimination).[15]

Finally, Plaintiff has not identified a disparately treated comparator. Under Title VII, discriminatory intent can be shown by either direct evidence of discriminatory animus or circumstantial evidence of such animus, including by showing disparate treatment among similarly situated employees. *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000). "'[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical.' In other words, the comparator must be similarly situated to the plaintiff 'in all material respects.'" *Ruiz*, 609 F.3d at 494 (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)); *see also Graham,* 230 F.3d at 40 ("That an employee's conduct need not be identical to that of another for the two to be similarly situated is also reflected in the language of *McDonnell Douglas*, where the Supreme Court used the phrase 'comparable seriousness' to identify conduct that might help to support an inference of discrimination."

---

[15] Greene's testimony that with respect to diversity issues, Madigan was "on a journey that is at a much slower pace than [she thought] the school need[ed]," does not add to Plaintiff's case. Dkt No. 90-5 at 95:20–21. Greene testified that in her opinion, Madigan was "not actively trying to understand" the complaints from marginalized communities, *id.* at 95:24–96:3, that he "would, like, say what you want to hear and try to say the right thing" but she felt that "he didn't always believe the things that were coming out of his mouth," *id.* at 100:5–11. None of these incidents or quotes can give rise to an inference that Madigan's decision to terminate Plaintiff's employment was more likely than not due, even in part, to Plaintiff's sexual orientation. At worst, it can be said that Madigan could have done more to build a supportive environment at Churchill, that he made efforts to "say the right thing" but appeared, to some, insincere, and that he had areas where he could grow in becoming more inclusive. Broad allegations that someone is "on a journey" with regard to diversity and inclusivity and could have been more supportive are insufficient to raise an inference of discriminatory intent. *See Manolov v. Borough of Manhattan Cmty. Coll.*, 952 F. Supp. 2d 522, 527 (S.D.N.Y. 2013) ("A plaintiff alleging racial or gender discrimination . . . must do more than recite conclusory assertions." (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 712–14 (2d Cir. 1994))).

(citation omitted)).  "What constitutes 'all material respects' therefore varies somewhat from case to case and . . . must be judged based on (1) whether the plaintiff and those [s]he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness."  *Graham*, 230 F.3d at 40 (citation omitted).  "The determination that two acts are of comparable seriousness requires—in addition to an examination of the acts—an examination of the context and surrounding circumstances in which those acts are evaluated."  *Id.*  "Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury."  *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003).

The only person whom Plaintiff offers as a possible comparator to himself is Wallin.  Dkt. No. 110 at 19.  Plaintiff alleges that Wallin has had issues controlling his anger and that Wallin was not disciplined for those issues.  But Wallin is not comparable, and the incident Plaintiff invokes is not comparable.  Plaintiff relies on one incident, the October 16, 2017 meeting between himself, Wallin, and Madigan, to substantiate that allegation.[16]  Plaintiff alleged in his EEOC complaint that, at the October 16, 2017 meeting, "Wallin belittled [Plaintiff] and became enraged," and that Wallin "later apologized to [Plaintiff] for his behavior, acknowledging that he had been angry."  Dkt. No. 102-2 ¶ 24.  Wallin acknowledged during an October 24, 2017 conversation with Plaintiff that during the October 16, 2017 meeting, he "got upset in the moment," Dkt. No. 86-26 at 6:14-15, and that he "lost it," *id.* at 26:1.  Both Wallin,

---

[16] To support this argument, Plaintiff argues that during Plaintiff's October 24, 2017 meeting with Wallin, Wallin admitted to "demonstrate[ing] [his] anger," "los[ing] it," "blow[ing] up," "get[ting] red in the face," and "get[ting] upset."  CSUF ¶ 377; Dkt. No. 86-26 at 8:9–17.  This is a misreading of the conversation.  These statements are Wallin referring to what *Plaintiff* should say to Madigan to acknowledge his past behavior, not Wallin admitting to his own misconduct.  RSUF ¶ 377.

Dkt. No. 95-2 at 99:15–17, and Madigan, Dkt. No. 95-3 at 119:3–5, dispute that Wallin became angry at the October 16 meeting.  In Wallin and Plaintiff's discussion of the meeting, Wallin acknowledged that he became frustrated with Plaintiff for not acknowledging prior issues with anger or accepting feedback, and that he apologized for not better supporting Plaintiff in the meeting.  Dkt. No. 95-2 at 104:6–9; *see* Dkt. No. 86-26 at 9:8–10 (transcript of October 24, 2017 conversation, in which Wallin stated "what I got frustrated with, and when I kind of lost it was kind of it just didn't seem like you were absorbing any of it, you know?"); *id.* at 15:19–22 (noting there are times where Plaintiff has been "very, very angry" and stating "that's why I got frustrated, because I'm like, Dennis, man, you're blowing this, because all you really need to do is say, you know what, this is an area where I need to work, and let's work on it, and I think that that brings you closer to that position.  Right?").

Even accepting Plaintiff's characterization of Wallin as belittling and enraged in the 2017 meeting, Wallin's purported conduct was not "of comparable seriousness" to the conduct Plaintiff was disciplined for.  *Graham*, 230 F.3d at 40 (citation omitted).  Plaintiff alleges Wallin became angry at fellow adult staff during a private meeting and shortly thereafter accepted responsibility and apologized for his conduct.  In contrast, Churchill terminated Plaintiff after several warnings and on the grounds that Plaintiff kicked in the door of the girls' bathroom and, in doing so, hit a student with the door, following a history of unprofessional conduct toward students and staff.  The termination letter also noted that Plaintiff "did not apologize or even acknowledge to the one student that she could have been injured by the force of the door."  Dkt. No. 97-15.  Moreover, the potential for physical harm at issue in the bathroom incident places Plaintiff's actions in a different category of harm than Wallin's alleged conduct.  *See* CSUF ¶ 33 (undisputed that the Employee Handbook contains a Workplace Violence Policy that includes a

zero-tolerance policy for conduct that threatens the safety of its community, including physically injuring another person).[17]  In sum, Plaintiff's conduct included repeated instances of anger and unprofessional conduct towards staff and students, a lack of accountability for such conduct, and an instance in which he hit a student with a door.  Wallin's single instance of anger, occurring five years prior to Plaintiff's termination, is not comparable conduct.  *See Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 464 (S.D.N.Y. 2006) ("When a plaintiff's misconduct is objectively more serious than that of a proposed comparator, differential treatment by the employer does not create an issue of fact that will defeat a motion for summary judgment.").

Plaintiff has not raised a genuine issue of material fact as to whether Defendant's legitimate reason for terminating his employment was pretextual.

### 2. Discrimination Under NYSHRL and NYCHRL

As with Plaintiff's Title VII claims, "discrimination claims under . . . the NYSHRL[] and the NYCHRL are governed by the familiar three-part *McDonnell Douglas* burden-shifting framework."  *Hanley v. N.Y.C. Health & Hosp. Corp.*, 722 F. Supp. 3d 112, 120 (E.D.N.Y. 2024) (citing *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010)); *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75–76 (2d Cir. 2015) (applying burden-shifting framework to NYCHRL claim).  Within this same burden-shifting framework, to state a claim for sex discrimination under the NYCHRL, "the plaintiff need only demonstrate 'by a preponderance of the evidence that she has been treated less well than other employees because of her gender.'"  *Mihalik v. Credit Agricole Cheuvreaux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013).  Following 2019 amendments to the NYSHRL, that more liberal standard applies to

---

[17] Plaintiff also alleges that Wallin engaged in the discriminatory conduct alleged in this lawsuit but was not terminated.  The alleged discriminatory comments are not of comparable seriousness or kind to Plaintiff's conduct, which Churchill found placed a student at risk of physical harm.

claims for sex discrimination under the NYSHRL as well. *See Moukdad v. NYU Langone Health Sys.*, 2026 WL 774270, at *6 (S.D.N.Y. Mar. 18, 2026) (applying same standard to both NYSHRL and NYCHRL claims); *see Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 122–23 (2d Cir. 2024) (in retaliation context, noting that following 2019 amendment, NYSHRL adopts "NYCHRL's more liberal pleading standard"). The NYSHRL and NYCHRL prohibit employers from discriminating based sexual orientation, among other things. *See* N.Y. Exec. Law § 296; N.Y.C. Admin. Code § 8-107(1)(a); *accord Small v. N.Y.C. Dep't of Educ.*, 650 F.Supp.3d 89, 97 (S.D.N.Y. 2023).

Under this standard, "a plaintiff must show that discrimination played a role in the employer's decision-making." *Brown v. Montefiore Med. Ctr.*, 2021 WL 1163797, at *8 (S.D.N.Y. Mar. 25, 2021) (citing *Ya-Chen Chen*, 805 F.3d at 75–76). If a defendant offers a "legitimate reason" for the adverse treatment and the plaintiff "fail[s] to raise a genuine dispute about whether" that reason was pretextual, the claim fails. *Ya-Chen Chen*, 805 F.3d at 76. "Even under the NYCHRL, '[t]he mere fact that [a] plaintiff may disagree . . . [and] think that [her] behavior was justified does not raise an inference of pretext.'" *Id.* at 76 (quoting *Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 35 (1st Dep't 2012)).

Plaintiff has failed to raise a genuine issue of material fact that discrimination based on his sexual orientation played any role in his termination decision, or that the individuals involved in the termination decision harbored any discriminatory animus toward him. As outlined above, he has produced as evidence of discriminatory intent only statements suggesting that the school administration could have been more supportive of LGBTQ staff and students; he has submitted no evidence suggesting that any of the individuals involved in the termination decision, including Bruna, Wallin, and Madigan, had discriminatory bias against him. Moreover, he has failed to

64

raise an inference of pretext with regard to the investigation of the bathroom incident or his ultimate termination, which was based on not solely the bathroom incident but a history of unprofessional conduct.  No reasonable jury could find that discriminatory motive played any role in the conclusion of the investigation.

Plaintiff's claims of discrimination thus fail under the NYSHRL and NYCHRL, as well as Title VII.  *Joseph v. Owens & Minor Distrib., Inc.*, 5 F. Supp. 3d 295, 321 (E.D.N.Y. Mar. 2014) ("Because there is no evidence from which a reasonable jury could find that discriminatory animus played any role in the decision to terminate Plaintiff, Plaintiff's discrimination claim under NYCHRL is dismissed."); *Wolf v. Time Warner, Inc.*, 548 F. App'x 693, 695–96 (2d Cir. 2013) (summary order) (NYCHRL claims fail where plaintiff "presented little, if any, evidence" of discriminatory animus from supervisors who fired her or from colleagues who reported negative comments about her).

Defendant's motion for summary judgment as to Plaintiff's claims of discrimination is granted.

### C.    Plaintiff's Claims of Retaliation

#### 1.    Retaliation Under Title VII

Retaliation claims under Title VII, the NYSHRL, and the NYCHRL are also analyzed under the *McDonnell Douglas* burden shifting framework.  *Edelman v. NYU Langone Health Sys.*, 141 F.4th 28, 45 (2d Cir. 2025); *Smith v. New York City*, 385 F. Supp. 3d 323, 345 (S.D.N.Y. 2019).  In order to establish a prima facie case of Title VII retaliation, a plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (citing *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)); *see also Knox*,

134 F.4th at 49.  As in the discrimination context, "[t]he plaintiff's burden of proof as to this first step 'has been characterized as minimal and *de minimis*.'"  *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013) (quoting *Jute*, 420 F.3d at 173).  "In determining whether this initial burden is satisfied in a Title VII retaliation claim, the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive."  *Jute*, 420 F.3d at 173.

Plaintiff has proffered evidence that establishes a prima facie case of retaliation. Plaintiff's June 14, 2022 email to Bruna constituted protected activity.[18]  "A complaint of discrimination constitutes protected activity if (1) the plaintiff holds a good-faith belief that he suffered discrimination because of a protected characteristic and (2) that belief is reasonable." *Bamba*, 2024 WL 3924810, at *12 (citing *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)).  There is no dispute that McConkey has offered evidence that his belief of being a victim of discrimination and harassment was genuine, held in good faith, and reasonable.  There also is no dispute that Churchill knew of the protected activity.  "[F]or purposes of a prima facie case, a plaintiff may rely on 'general corporate knowledge' of [his] protected activity to establish the knowledge prong of the prima facie case."  *Andalex Grp. LLC*, 737 F.3d at 844 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000)). Were the rule otherwise, "a simple denial by a corporate officer that the officer ever

---

[18] Plaintiff also relies on his conversation with Greene, in which he told her about Wallin's conduct in reminding him of the whiteboard incident following a sexual harassment training, which discussed that repeated references to prior harassment might itself constitute harassment. Dkt. No. 110 at 27.  Plaintiff states that this conversation occurred "[s]oon after" the September 2021 training.  CSUF ¶¶ 341–42.  The Court previously found that this activity—raising a concern of harassment to an administrative-level employee—constitutes protected activity. *McConkey v. Churchill Sch. & Ctr.*, 2025 WL 2062195, at *12 (S.D.N.Y. July 23, 2025). However, Plaintiff has not demonstrated any connection between his conversation with Greene and his termination, nor has he argued that any connection exists.  Dkt. No. 110 at 30–32.

communicated the plaintiff's complaint, no matter how reasonable the inference of communication, would prevent the plaintiff from satisfying her prima facie case[.]" *Id.* Here, there is no dispute that Madigan himself was aware of the complaint of discrimination.

"Termination is plainly sufficient to constitute an adverse employment action for the purposes of a discrimination or retaliation claim." *McConkey*, 2025 WL 2062195, at *13; *see Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006) (an adverse action for purposes of Title VII retaliation is any action that "could well dissuade a reasonable worker from making or supporting a charge of discrimination"). Finally, at the prima facie stage, a plaintiff may show causation either indirectly, "by showing that the protected activity was closely followed in time by the adverse [employment] action," *Andelex Grp. LLC*, 737 F.3d at 845 (quoting *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001)), or directly, "through evidence of retaliatory animus directed against the plaintiff by the defendant," *Hicks*, 593 F.3d at 170 (quoting *Gordon*, 232 F.3d at 117). Plaintiff has proffered evidence that his termination came at the "first actual opportunity to retaliate," since it came shortly after the beginning of a new school year. *Summa v. Hofstra University*, 708 F.3d 115, 128 (2d Cir. 2013); *see also Lively*, 2026 WL 905447, at *63; *McConkey*, 2025 WL 2062195, at *14; *Bamba*, 2024 WL 3924810, at *19.

However, as with Plaintiff's discrimination claim, Defendant has proffered a legitimate, non-retaliatory reason for the termination of Plaintiff's employment. Plaintiff behaved in an unprofessional and inappropriate manner in his interaction with the students on October 18, 2022, he had a history of inappropriate conduct, and he had twice been warned that angry outbursts or unprofessional behavior could lead to the termination of his employment. "Under the *McDonnell Douglas* framework, after the defendant has articulated a non-retaliatory reason

67

for the employment action, the presumption of retaliation arising from the establishment of the prima facie case drops from the picture." *Andalex Grp. LLC*, 737 F.3d at 845 (citing *Weinstock*, 224 F.3d at 42). Plaintiff then has the burden of proving that his "protected activity was a but-for cause of [his] firing, which [h]e can do by showing that [Defendant's] proffered reason [was] pretextual." *Knox*, 134 F.4th at 49 (internal quotation marks omitted) (quoting *Andalex Grp. LLC*, 737 F.3d at 845–46); *see Hamilton Sunstrand Corp.*, 420 F.3d at 173 ("[O]nce an employer offers such proof, the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action.").

While Plaintiff could rely on temporal proximity to show causation for his prima facie case, *McConkey*, 2025 WL 2062195, at *14, at the summary judgment stage, Plaintiff cannot rely on temporal proximity alone to show pretext, *see Knox*, 134 F.4th at 50; *accord Bamba*, 2024 WL 3924810  at *22. "An employee who has been repeatedly reprimanded and who sees the writing on the wall '[cannot] shield herself from legitimate managerial prerogatives by threatening a discrimination complaint and then alleging unlawful retaliation.'" *Vitale v. Equinox Holdings, Inc.*, 2019 WL 2024504, at *13 (S.D.N.Y. May 7, 2019) (quoting *Lee v. Healthfirst, Inc.*, 2007 WL 634445, at *24 (S.D.N.Y. Mar. 1, 2007)); *accord Boatright v. U.S. Bancorp*, 2020 WL 7388661, at *20–21 (S.D.N.Y. Dec. 16, 2020), *aff'd*, 2022 WL 351059 (2d Cir. Feb. 7, 2022) (summary order). Instead, "a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence . . . , to defeat summary judgment at th[e] [summary judgment] stage." *Andalex Grp. LLC*, 737 F.3d at 847. Evidence that the decisionmaker made discriminatory or retaliatory comments about or to the plaintiff "not long before" firing the plaintiff can help demonstrate that the proffered reason for the employer's action is pretextual. *Knox*, 134 F.4th at 48. In addition, "[a] plaintiff may prove

68

that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action.  From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason."  *Andalex Grp. LLC*, 737 F.3d at 846.  "[A] jury issue on the question of pretext may be created when an employer offers inconsistent and varying explanations for its decision to terminate a plaintiff."  *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 170 (2d Cir. 2001).  "Evidence showing disparate treatment of 'similarly situated employees' may support a finding that an 'adverse job action was a pretext for . . . discrimination.'"  *Nambiar*, 158 F.4th at 365 (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000)).

There are no facts in the record here that could cause a jury to infer a retaliatory motive on Defendant's part.  First, for the same reasons noted above, no reasonable jury could find that Defendant's investigation into the bathroom incident suffered from weaknesses or discrepancies so as to render it pretextual.  Second, Defendant consistently expressed concern regarding Plaintiff's ability to control his temper, and this concern preceded Plaintiff's protected activity. *See Ya-Chen Chen*, 805 F.3d at 69 (granting summary judgment as to Title VII and NYCHRL retaliation where defendant "took issue with [plaintiff's] collegiality long before" protected activity).  In October 2017, Wallin talked with Plaintiff about his anger and noted that he wanted Plaintiff to "understand that [he does] impact staff," and that they had "talked about that pretty consistently."  Dkt. No. 86-26 at 12–13.  The December 2017 suspension letter notes multiple instances where Plaintiff lost his temper or was insensitive to students or staff.  Dkt. No. 97-7. Plaintiff's spring 2020 performance review noted his "historic issues arising from his difficulty with anger management."  Dkt. No. 97-17.  In the June 2021 email, Wallin again noted

"[n]egativity toward other Churchill professionals." Dkt. No. 102-10.  All of these instances predated both Plaintiff's conversation with Greene, which occurred sometime after September 2021, and his June 2022 email.

Plaintiff also cannot rely on the "positive feedback" in his performance reviews regarding his strength as a teacher to create an inference of pretext.  An employer can praise what is positive with an employee's conduct while at the same time criticizing what is concerning about the employee's conduct.  *See McGuire-Welch v. House of the Good Shepherd*, 720 F. App'x 58, 60 (2d Cir. 2018) (summary order) (affirming summary judgment for defendant where plaintiff alleged that the reason for firing was incredible due to positive past performance reviews, as those reviews also noted similar performance issues raised in termination).  Although Defendant's reviews noted Plaintiff's positive performance as a teacher and as a mentor, the reviews "also consistently reflect concerns" with McConkey's anger management.  *See Goldzweig*, 2026 WL 21005, at *2.  The two are not inconsistent.

Third, Plaintiff points to the fact that three days prior to his termination, on October 24, 2022, Madigan scanned a printed copy of the June 2022 email.  CSUF ¶ 410; RSUF ¶ 410.  That evidence does not show that the stated reasons for Plaintiff's termination were pretextual or that Plaintiff's complaints were a cause of his termination.  It is sensible that an employer who is contemplating the possibility of terminating an employee's employment would check into whether the employee had previously made any complaints and the nature of the complaints.  That the employer has engaged in such prudent conduct does not show that it has acted on the basis of the complaint.  Madigan testified that he printed the copy of the email in order to have an electronic version of the email.  Dkt. No. 90-3 at 188:24.  That Madigan digitized Plaintiff's complaint prior to terminating him does not, on its own, create an inference of retaliation,

70

especially in the context of Plaintiff's suspension and the investigation which had commenced six days earlier. Both Wallin and Bruna testified that Plaintiff's June 14, 2022 email complaining of harassment was, in fact, not discussed between themselves or with Madigan at all in October 2022 when Plaintiff was terminated. Dkt. No. 90-4 at 256:24–257:7; Dkt. No. 90-2 at 237:22; *see also* Dkt. No. 90-3 at 190:11–24 (Madigan testifying that he did not discuss whether anything should be done in regard to the complaint in October 2022 and testifying that he never spoke with Wallin about the email). Plaintiff has offered no reason to doubt the legitimacy of the investigation that led to his firing, and Madigan testified as to his thought-process in deciding to terminate Plaintiff's employment: "He'd been through anger management already and had been on notice that further behaviors could lead to termination. And this [bathroom incident], to me, was the last straw." Dkt. No. 90-3 at 250:16–25. Given the context of Defendant's investigation and Plaintiff's record at Churchill, no reasonable jury could find that the June 2022 email was the "but-for" cause of Plaintiff's termination based solely on the fact that Madigan scanned the email in the midst of the investigation. *See Nambiar*, 158 F.4th at 367.

Plaintiff has failed to raise a genuine issue of material fact as to whether his June 2022 email was the but-for cause of his termination. Defendant's motion for summary judgment is therefore granted as to Plaintiff's claims of retaliation under Title VII.

### 2. Retaliation under NYSHRL and NYCHRL

Compared to retaliation claims under Title VII, "[t]he NYCHRL and NYSHRL employ a more liberal standard: '[A] plaintiff claiming retaliation must demonstrate that she took an action opposing her employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action.'" *Edelman*, 141 F.4th at 45 (quoting *Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 122 (2d Cir. 2024)). "Even under this 'less demanding standard,' the plaintiff must establish a 'causal link'—'that there was

71

a causal connection between [her] protected activity and the employer's subsequent action, and must show that a defendant's legitimate reason for [her] termination was pretextual or motivated at least in part by an impermissible motive.'" *Mercado v. Mount Sinai Beth Israel*, 2023 WL 5975322, at *16 (S.D.N.Y. Sept. 14, 2023) (quoting *Livingston v. City of New York*, 563 F. Supp. 3d 201, 246, 250 (S.D.N.Y. 2021)). Rather than a "but-for" cause, under the New York statutes, Plaintiff must demonstrate that his protected activity was at least a motivating factor in his termination. *See Ronen v. RedRoute, Inc.*, 763 F. Supp. 3d 319, 334 (E.D.N.Y. 2025). Summary judgment on a NYSHRL and NYCHRL retaliation claim "is appropriate only if the plaintiff cannot show that retaliation played any part in the employer's decision." *Mihalik*, 715 F.3d at 116.

As with claims under Title VII, however, temporal proximity alone is insufficient to raise a genuine issue as to whether retaliation played a part in the employer's decision. "[W]hen Plaintiff's sole evidence of pretext is the temporal proximity between Plaintiff's complaints and Defendants' discipline, a NYCHRL retaliation claim cannot survive summary judgment if the employer has shown a non-retaliatory reason for the plaintiff's mistreatment." *Sivio v. Vill. Care Max*, 436 F. Supp. 3d 778, 802 (S.D.N.Y. 2020) (internal quotation marks omitted); *accord Ya-Chen Chen*, 805 F.3d at 77; *see also Abromavage v. Deutsche Bank Sec. Inc.*, 249 N.Y.S.3d 12, 17 (1st Dep't 2026) ("[T]emporal proximity, standing alone, creates at most a prima facie inference of causation.").

Here, Plaintiff presents a single piece of evidence in addition to temporal proximity in support of his retaliation claim: Madigan scanning the June 2022 email to himself shortly before the termination decision. New York courts have "emphasize[d] that the [NYCHRL]'s liberal construction rule lowers the causation threshold, not the evidentiary one." *Abromavage*, 249

72

N.Y.S. 3d at 18.  Where a "plaintiff offer[s] nothing but speculation that any of the defendants' challenged actions were motivated, even in part, by unlawful discrimination or retaliation, [] such speculation is insufficient to defeat summary judgment." *Ellison v. Chartis Claims, Inc.*, 115 N.Y.S.3d 53, 59 (2d Dep't 2019).  For a jury to find a retaliatory motive from Madigan's act in scanning the email, it would have to engage in undue speculation—speculation that because there is some evidence Madigan reviewed Plaintiff's complaint in the midst of an investigation into his conduct, Madigan was motivated by an impermissible retaliatory motive.  Plaintiff has presented no evidence that any decision-maker discussed Plaintiff's complaint in October of 2022, made a negative comment to him regarding the complaint, or otherwise acted coldly or in a hostile manner following the complaint.  *Cf. Knight v. MTA*, 2026 WL 875339, at *5 (E.D.N.Y. Mar. 31, 2026) (finding "just enough [evidence] to withstand summary judgment" on NYCHRL and NYSHRL retaliation claims where supervisor commented, "If you had [to do it] over, would you still sue transit?"); *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 851 (S.D.N.Y. 2013) (granting summary judgment for defendant as to retaliation under Title VII, but denying as to retaliation under NYCHRL, where plaintiff supplied evidence that two supervisors acted with hostility towards plaintiff shortly following protected activity).  Plaintiff has not raised a triable issue as to whether Defendant was influenced, even in part, by retaliatory motive.  Defendant's motion for summary judgment as to Plaintiff's claims of retaliation is therefore granted.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for sanctions is DENIED and Defendant's motion for leave to file an answer is GRANTED IN PART and DENIED IN PART.

Defendant's motion for summary judgment is GRANTED.

The Clerk of Court is respectfully requested to enter judgment for Defendant and to close this case.

SO ORDERED.

Dated: May 13, 2026
     New York, New York

_____
          LEWIS J. LIMAN
        United States District Judge